IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GREAT NORTHERN INSURANCE CO., as )
Subrogee of Croatian Fraternal Union of )
America, )
                      )      Civil Action No. 06-90
       Plaintiff, )
                      )      Judge Terrence F. McVerry
          v. )      Magistrate Judge Lisa Pupo Lenihan
                      )
ADT SECURITY SERVICES, INC., )      Doc. No. 13
       Defendant.

## OPINION

McVERRY, J.

      Currently before the Court for disposition is Defendant's Motion for Summary Judgment. In this subrogation action, Plaintiff, Great Northern Insurance Company ("Great Northern"), seeks to recover monies it paid its insured, the Croatian Fraternal Union of America ("CFU"), under a property insurance policy for damages sustained to CFU's building containing its office and museum, when a broken pipe in its sprinkler system went undetected for a period of time. Great Northern has brought claims of negligence and breach of implied warranty against Defendant, ADT Security Services, Inc. ("ADT"), with regard to its conduct in servicing and/or arranging for the repair of a component part of the panel box that monitors CFU's fire protection and alarm system.

      Plaintiff has alleged that this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a), but Defendant disputes this allegation, contending that the amount in controversy is less than the statutory minimum. Venue in this District is proper under 28 U.S.C. § 1391, as the events giving rise to this lawsuit occurred in this district.

The issues presented here are: (1) whether CFU and ADT intended, either by their words or conduct, to include in their agreement for service and repair of CFU's alarm system, the terms and conditions, including a limitation of liability provision, contained on the reverse side of a service ticket, issued by ADT for proposed repair to a component part of CFU's alarm system and signed by an employee of CFU; and, if so, (2) whether a limitation of liability provision, limiting damages to $ 1,000.00 contained on the reverse side of the service ticket, is valid and enforceable.  ADT contends that CFU assented to the inclusion of the terms and conditions either through its employee's signature on the Service Ticket and/or through its prior course of dealings.  ADT further contends that the limitation of liability provision is  valid and enforceable, and the language is broad enough to apply to losses resulting from gross negligence.  Therefore, ADT contends the amount of damages at issue here is limited to $ 1,000.00 per claim; consequently, subject matter jurisdiction is lacking as the amount in controversy does not exceed $75,000.00, as required under 28 U.S.C. §1332(a).  On the other hand, Great Northern denies that CFU officers or employees agreed to or had actual knowledge of the limitation of liability provision contained on the reverse side of the Service Ticket, and therefore, there was no meeting of the minds as to including the limitation of liability provision in CFU's implied contract with ADT.  Great Northern submits that at the very least, material issues of fact exist thereby precluding summary judgment.  Alternatively, Great Northern contends that if the Court finds that CFU assented to the inclusion of the limitation of liability provision, that provision should not be enforced because it violates public policy, is unconscionable, and constitutes a contract of adhesion.

For the reasons set forth below, the Court will deny Defendant's Motion for Summary Judgment on the issue of whether the "Limitation of Liability" provision is part of the parties'

2

bargain, and will grant Defendant's Motion for Summary Judgment in all other respects.

## I.    FACTS AND PROCEDURAL HISTORY

The following facts, stated in the light most favorable to Great Northern, are not disputed.

CFU is a fraternal benefit association which maintains its home office and museum at 100 Delaney

Drive, Pittsburgh, Pennsylvania ("CFU's premises").   In January of 1989, CFU contracted with

Rollins Protective Service ("Rollins") for the purchase and installation of a security detection system

for the purposes of monitoring the fire detection and security protection at CFU's premises.   (Rollins

Security Agreement dated January 18, 1989 (Ex. A to Def.'s Ans. to Am. Compl.).)   In addition to

the sale and installation of the security detection system, Rollins also provided monitoring and

maintenance services to CFU for a three-year period.   (*Id.*)   Included in the Rollins Security

Agreement dated January 18, 1989, are certain terms and conditions, most notably: (1) a Limited

Warranty, disclaiming all other express or implied warranties with regard to the detection system;

(2) an Insurance provision, acknowledging CFU's knowledge and agreement that Rollins is not an

insurer of CFU's property and CFU has the sole responsibility to maintain adequate insurance

coverage; and (3) a Limitation of Liability provision, which provides in relevant part:

> **LIMITATION OF LIABILITY**: All charges and fees hereon are based solely
> on the cost of the Detection System and the services herein set forth, and are unrelated to the
> value of CUSTOMER'S property or the property of others which may be located
> on CUSTOMER'S premises.
> CUSTOMER ACKNOWLEDGES AND AGREES THAT IF ANY
> LOSS OR DAMAGE SHOULD RESULT FROM THE FAILURE
> OF THE DETECTION SYSTEM, OR THE MONITORING
> SERVICE, OR FROM IMPROPER DESIGN, INSTALLATION,
> MAINTENANCE, OR REPAIR OF THE DETECTION SYSTEM,
> WHETHER WITHIN THE LIMITED WARRANTY PERIOD OR
> OTHERWISE, [ROLLIN]'S LIABILITY, IF ANY, FOR SUCH
> LOSS OR DAMAGE SHALL BE LIMITED TO A SUM NOT
> GREATER THAN FIVE HUNDRED DOLLARS ($500.00).   IN
> THE EVENT PARTIES DESIRE TO IMPOSE GREATER

LIABILITY UPON THE OBLIGATIONS HEREUNDER, CUSTOMER MAY REQUEST AN INCREASED LIMITED LIABILITY BY OFFERING TO PAY AN ADDITIONAL AMOUNT OF TEN (10%) PERCENT OF THE INCREASED LIMIT (MINIMUM OF $100.00 INCREMENTS) AND, IF ACCEPTED BY [ROLLINS], AN ADDITIONAL RIDER SIGNED BY THE PRESIDENT OF ROLLINS, INC. SHALL BE ATTACHED TO THIS AGREEMENT SETTING FORTH THE ADDITIONAL LIABILITY OF [ROLLINS]. I HAVE READ THIS CLAUSE AND CHOOSE _____ DO NOT CHOOSE _____ AN INCREASED

<small>(Cust. Initial)                        (Cust. Initial)</small>

LIABILITY.

Under no circumstances shall [Rollins] be liable to CUSTOMER or any other person for incidental or consequential damages of any nature in excess of such amount, including without limitation damages to property, loss of property or revenue, or cost of replacement goods, however, occasioned, and whether alleged to result from [Rollin]'s breach of warranty, negligence, through strict liability in tort, or otherwise.

(Rollins Service Agreement dated 1/18/89, Parts I.B. & L.; Part VIII (Ex. A to Def.'s Answer to Am. Compl.).)  CFU initialed the line for "do not choose an increased liability."  This agreement was signed by the Secretary/Treasurer of CFU at the time.[1]

Subsequently, in April of 1992, Rollins and CFU executed a new purchase and service agreement, extending the maintenance and monitoring service for five years.  (Ex. C to Def.'s Ans. to Am. Compl.)  After the initial five year period, the contract would be renewed on a year-to-year basis unless otherwise terminated.  The April 1992 agreement included similar, if not identical, provisions as to the limited warranty, insurance notice, and limitation of liability, and was signed by

---

[1]The current Secretary/Treasurer of CFU, Edward W. Pazo, has held that position since December 1, 1993.  (Affidavit of Edward W. Pazo dated November 28, 2006 ("Pazo Aff."), ¶ 1 (Ex. C in Pl.'s Appendix Pursuant to W.D.PA. LR 56.1(c)(3) ("Pl.'s App.")).)  Thus, although he did not sign the Rollins Security Agreement dated January 18, 1989, or the subsequent agreement dated April 8, 1992, Mr. Pazo took over as CFU's Secretary/Treasurer while 1992 Rollins contract was in effect.  Therefore, as an officer of CFU, Mr. Pazo should have been familiar with the contracts in place at that time; he does not deny this in his affidavit.

the Secretary/Treasurer of CFU at the time.[2]  (*Id.*)

The record also shows a service order ticket issued by Rollins on June 23, 1995 for repairs performed, and handwritten on the customer signature line is the name "Robert D. Keber." (Ex. D to Def.'s Ans. to Am. Compl.)  The following notice appears on the bottom of the service order ticket in capital letters: "**CUSTOMER NOTICE!**  SEE REVERSE FOR IMPORTANT CUSTOMER INFORMATION." (*Id.*)  On the reverse side of the Rollins service order ticket is a limitation of liability provision, which includes a notice regarding insurance, almost identical to the one contained in the previous Rollins contracts.

Sometime prior to September of 1999, the contract between Rollins and CFU was terminated. By September of 1999, CFU was utilizing SecurityLink for its service and maintenance needs. (Ex. E to Def.'s Ans. to Am. Compl.)  On one documented occasion, CFU made a service call to SecurityLink, which responded on September 1, 1999 and completed a service call report indicating the repair done and the cost of labor and materials.  This service call report also appears to be signed by Robert D. Keber as CFU's representative, and immediately above his signature, in the same font type and size, the following sentence appears: "See terms and conditions on reverse side." (*Id.*)  The second numbered paragraph on the reverse side of the SecurityLink service call report is entitled "LIMITATION OF LIABILITY" and contains a notice regarding insurance coverage and a limitation of liability provision substantially similar to the one previously set forth in the Rollins contracts.

On or about August 10, 2001,[3] ADT notified CFU that it had acquired SecurityLink and that

---

[2]*See* Note 1, *supra.*

[3]This date is handwritten on the letter from ADT informing CFU that it acquired SecurityLink and that the invoices for the monitoring service would now come from ADT. (Ex. A in Def.'s Appendix Pursuant to W.D.PA. LR 56.1(B)(3) ("Def.'s App.").)

it would now be providing monitoring services.  (Ex. A in Def.'s App.) ADT acquired the CFU account solely as a result of its acquisition of SecurityLink, and the subsequent servicing of SecurityLink's existing customers.  Thus, ADT took over the monthly monitoring service of CFU's alarm system by virtue of its acquisition of SecurityLink, and issued monthly invoices for such service.  (Ex. A and C in Def.'s App.)

After ADT acquired the CFU monitoring account, if and when its alarm system needed to be maintained or serviced, CFU contacted ADT and a service call was requested.  CFU and ADT never discussed, negotiated, or entered into any written contract or agreement for the maintenance or service of CFU's alarm system.  Each time ADT performed service or repair for CFU, it issued either an ADT Service Ticket ("Service Ticket"), ADT Service Authorization ("Service Authorization"), and/or an ADT Service Documentation ("Service Documentation").

On or about November 17, 2004, a "service com failure" warning[4] appeared on the ADT Security Monitoring Center ("Monitoring Center") located on CFU's premises.  Consequently, CFU's Facilities Manager, Robert D. Keber, contacted ADT to report the failure and request maintenance.  The next day, November 18, 2004, Kevin Ferri of ADT responded to the service call and upon arrival at CFU's premises, accompanied Mr. Keber to the Monitoring Center.  Mr. Keber advised Mr. Ferri that the alarm system had been experiencing a "service com failure" since June 2004.  Mr. Ferri inspected the alarm system, determined that a component part located within the Radionics Panel, a "dialer," was not operating properly and therefore, the Radionics panel could not communicate with the ADT Security monitoring center.  (Ferri Aff. ¶ 11.)  Mr. Ferri informed Mr.

_____

[4]A "service com failure" refers to a "notice that indicates the Radionics Panel located at [CFU's premises] could not, or cannot communicate with the ADT Security monitoring center." (Affidavit of Kevin Ferri ("Ferri Aff."), ¶ 9 (Ex. D in Def.'s App.).)

Keber that the Radionics Panel had to be removed and sent to Bosch in California for service and/or repair. (Affidavit of Robert Keber ("Keber Aff."), ¶ 11 (Ex. B in Pl.'s App.); Ferri Aff. ¶ 12.) Mr. Keber, aware that there would be no communication from CFU's Monitoring Center to the ADT central station, agreed to the removal of the Radionics panel but stated that it had to be returned as soon as possible. (Keber Aff. ¶ 11(d) & (e).) Thereafter, Mr. Ferri removed the Radionics panel, completed and signed the front of the Service Ticket, and then presented it to Mr. Keber for signature, which he also signed on the front. (Keber Aff. ¶ 11(f) - (i).)

The reverse side of the November 18, 2004 Service Ticket contains certain Terms and Conditions, the first of which appearing at the top is entitled "LIMITATION OF LIABILITY" and provides in relevant part:

> IT IS UNDERSTOOD THAT ADT IS NOT AN INSURER, THAT INSURANCE, IF ANY, SHALL BE OBTAINED BY THE CUSTOMER AND THAT THE AMOUNTS PAYABLE TO ADT HEREUNDER ARE BASED ON THE VALUE OF SERVICES AND THE SCOPE OF LIABILITY AS HEREIN SET FORTH AND ARE UNRELATED TO THE VALUE OF THE CUSTOMER'S PROPERTY OR PROPERTY OF OTHERS LOCATED IN CUSTOMER'S PREMISES. CUSTOMER AGREES TO LOOK EXCLUSIVELY TO CUSTOMER'S INSURER TO RECOVER FOR INJURY OR DAMAGE IN THE EVENT OF ANY LOSS OR INJURY AND RELEASES AND WAIVES ALL RIGHT OF RECOVERY AGAINST ADT ARISING BY WAY OF SUBROGATION. ADT MAKES NO GUARANTY OR WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS THAT THE SYSTEM OR SERVICES SUPPLIED, WILL AVERT OR PREVENT OCCURRENCES OR THE CONSEQUENCES THEREFROM, WHICH THE SYSTEM OR SERVICE IS DESIGNED TO DETECT. IT IS IMPRACTICAL AND EXTREMELY DIFFICULT TO FIX THE ACTUAL DAMAGES, IF ANY, WHICH MAY PROXIMATELY RESULT FROM FAILURE ON THE PART OF ADT TO PERFORM ANY OF ITS OBLIGATIONS HEREUNDER. THE CUSTOMER DOES NOT DESIRE THIS CONTRACT TO

PROVIDE FOR FULL LIABILITY OF ADT AND AGREES THAT ADT SHALL BE EXEMPT FROM LIABILITY FOR LOSS, DAMAGE OR INJURY DUE DIRECTLY OR INDIRECTLY TO OCCURRENCES, OR CONSEQUENCES THEREFROM, WHICH THE SERVICE OR SYSTEM IS DESIGNED TO DETECT OR AVERT; THAT IF ADT SHOULD BE FOUND LIABLE FOR LOSS, DAMAGE OR INJURY DUE TO A FAILURE OF SERVICE OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED TO A SUM EQUAL TO 10% OF THE AGGREGATE PRICE REFLECTED ON THE FRONT HEREOF OR $ 1,000, WHICHEVER IS GREATER, AS THE AGREED UPON DAMAGES AND NOT AS A PENALTY, AS THE EXCLUSIVE REMEDY; AND THAT THE PROVISIONS OF THIS PARAGRAPH SHALL APPLY IF LOSS, DAMAGE, OR INJURY IRRESPECTIVE OF CAUSE OR ORIGIN, RESULTS DIRECTLY OR INDIRECTLY TO PERSON OR PROPERTY FROM PERFORMANCE OR NONPERFORMANCE OF OBLIGATIONS IMPOSED BY THIS CONTRACT OR FROM NEGLIGENCE, ACTIVE OR OTHERWISE, STRICT LIABILITY, VIOLATION OF ANY APPLICABLE CONSUMER PROTECTION LAW OR ANY OTHER ALLEGED FAULT ON THE PART OF ADT, ITS AGENTS OR EMPLOYEES. . . . IF THE CUSTOMER DESIRES ADT TO ASSUME A GREATER LIABILITY, ADT SHALL AMEND THIS AGREEMENT BY ATTACHING A RIDER SETTING FORTH THE AMOUNT OF ADDITIONAL LIABILITY AND THE ADDITIONAL AMOUNT PAYABLE BY THE CUSTOMER FOR THE ASSUMPTION BY ADT OF SUCH GREATER LIABILITY PROVIDED, HOWEVER, THAT SUCH RIDER AND ADDITIONAL OBLIGATION SHALL IN NO WAY BE INTERPRETED TO HOLD ADT AS AN INSURER, IN THE EVENT ANY PERSON, NOT A PARTY TO THIS AGREEMENT, SHALL MAKE ANY CLAIM OR FILE ANY LAWSUIT AGAINST ADT IN ANY WAY RELATING TO THE EQUIPMENT OR SERVICES THAT ARE THE SUBJECTS OF THIS AGREEMENT, INCLUDING FOR FAILURE OF ITS EQUIPMENT OR SERVICE IN ANY RESPECT; . . .

(Ex. B1 in Def.'s App.)[5]   In addition, the Service Ticket contains the following "GENERAL" Term

and Condition:

---

[5]The actual font size of the "Limitation of Liability" provision on the document included in Defendant's appendix is much smaller, and appears to be a 6 font.

ADT ASSUMES NO LIABILITY FOR DELAYS IN INSTALLATION OF THE EQUIPMENT, OR FOR INTERRUPTIONS OF SERVICE DUE TO STRIKES, RIOTS, FLOODS, FIRES, ACTS OF GOD OR ANY CAUSES BEYOND THE CONTROL OF ADT AND WILL NOT BE REQUIRED TO SUPPLY SERVICE TO THE CUSTOMER WHILE INTERRUPTION OF SERVICE DUE TO ANY SUCH CAUSE SHALL CONTINUE.

(*Id.*)  With regard to "EQUIPMENT DISCONNECTIONS," the Service Ticket states: "This represents ADT's notice to you that the system(s)/device(s) listed on the face of this Service Ticket as temporarily or permanently disconnected are no longer in service and, thus, cannot detect and/or report occurrences or transmit signals." (*Id.*)  In addition, the November 18, 2004 Service Ticket contains the following information on the front side inserted by the ADT service technician, Mr. Ferri:  "Customer understands that Security/Fire protection at site will be out of service."  (*Id.*)

Mr. Keber contends he never turned over the Service Ticket, he was not aware of the pre-printed "Terms and Conditions" and "Limitation of Liability" provisions on the back of the Service Ticket, nor was he told to turn over and review the pre-printed language contained on the reverse side of the Service Ticket.  (Keber Aff. ¶ 11(k).)

On or about January 23, 2005, a pipe in the sprinkler system broke at CFU's premises, causing the premises' deluge system to activate, which went undetected for a substantial period of time.  Consequently, severe and extensive water damage and destruction was caused to the real and personal property located on CFU's premises, exceeding $ 830,000.00.  Pursuant to the property damage insurance policy issued by Great Northern to CFU on its building and contents, Great Northern made payments to CFU for the damage to its property and contents.

Three days later, on January 26, 2005, ADT returned to CFU and installed the repaired

Radionics panel.  On January 27, 2005, ADT issued an invoice for labor and parts associated with its service of CFU's security system on November 18, 2004 and January 26, 2005, showing a total amount due of $ 1,126.38.  (Ex. C-2 (Bates No. 11014) in Def.'s App.; and Affidavit of Kim Talento ("Talento Aff."), ¶ 13 (Ex. F in Def.'s App.).)

Great Northern became subrogated to the rights of CFU as a result of such payment and subsequently instituted the present action on February 2, 2006, alleging claims of negligence, gross negligence, and breach of implied warranty against ADT.[6]  Great Northern later dismissed its claim for gross negligence and filed an amended complaint on April 3, 2006.[7]  Great Northern contends that ADT was negligent and breached an implied warranty by failing to properly inspect, maintain, service and repair the alarm system, including the Radionics Panel, and that such failure allowed the deluge system to flow undetected for a substantial period of time in violation of the applicable building and fire codes.  ADT filed an Answer to the Amended Complaint, raising the affirmative defense that the pre-printed "Terms and Conditions" and "Limitation of Liability" provision contained on the reverse side of the Service Ticket, which limits ADT's liability to $1,000.00, were agreed to by a CFU employee with authority to do so, and therefore, were enforceable. Subsequently, ADT filed a motion for summary judgment.  As this motion and Plaintiff's response thereto have been fully briefed, the motion is ripe for disposition.

---

[6]The implied warranty allegedly breached is a failure to complete the repairs to CFU's security system in a good and workmanlike manner.  (Am. Compl. ¶¶ 24-25.)

[7]Although Great Northern dropped its separate cause of action for gross negligence, the Amended Complaint contains allegations regarding ADT's conduct (Am. Compl. ¶¶ 21-22) which potentially state a theory and/or standard of care of gross negligence.  *See* discussion, *infra,* in Section III, Part D, regarding gross negligence.

II.     **STANDARD OF REVIEW**

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by *Matsushita* Court).  An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

III.    **ANALYSIS**

ADT has moved for summary judgment asking this Court to find as a matter of law that the ADT Service Ticket is a valid and enforceable contract, including the "Limitation of Liability" provision on the reverse side of the Service Ticket, and therefore, its liability, if any, to Great Northern, is limited to $ 1,000.00.  In support of its position, ADT submits that the November 18, 2004 Service Ticket is a contract that confirms that CFU mutually assented to an agreement

11

containing a Limitation of Liability provision, exchanged consideration for the agreement, and delineated the terms of their bargain with sufficient clarity. ADT further contends that limitation of liability provisions, such as the one contained in the ADT Service Ticket, are standard in security and alarm monitoring services agreements and accepted in the security and alarm monitoring services industry. According to ADT, these provisions have been found to be valid and are regularly enforced by state and federal courts applying Pennsylvania law. The same limitation of liability provision is also contained in other service authorization documents executed by ADT and authorized by CFU representatives. Consequently, ADT submits as a matter of law that the limitation of liability provision at issue here limits its liability for any and all claims asserted against it, including but not limited to negligence, gross negligence, and breach of implied warranties, to $1,000.00. Accordingly, ADT contends that this Court lacks subject matter jurisdiction as the amount in controversy does not exceed the statutory amount and seeks dismissal of the action.

Great Northern counters that the undisputed facts here establish that there was no written contract between CFU and ADT regarding the maintenance and service of the Monitoring System, including the Radionics Panel, and that the terms of the Service Ticket were presented after Mr. Ferri completed his work on November 18, 2004, and were never discussed, negotiated or agreed to by anyone with authority to contractually bind either ADT or CFU. Great Northern argues that the Service Ticket clearly cannot constitute a binding contract between CFU and ADT because: (1) it was presented after the services were performed; (2) there was no bargained for, agreed to or meeting of the minds as to its terms; (3) the individual signing the Service Ticket was not authorized to bind, nor capable of contracting on behalf of, CFU; and (4) no consideration was given for the

alleged contract contained in the Service Ticket.[8]  Great Northern further submits that the "Terms and Conditions" and  "Limitation of Liability" provisions on the reverse side of the Service Ticket never formed a part of the contract and therefore cannot be enforced.  In the event the Court finds the "Limitation of Liability" provision was part of the contract between CFU and ADT, Great Northern argues that "Limitation of Liability" provision is invalid and unenforceable because it contravenes public policy, purports to exculpate ADT from violations of building and fire codes designed to protect human life, and constitutes a contract of adhesion.  At a minimum, Great Northern contends that numerous issues of material fact exist precluding summary judgment. Accordingly, Great Northern contends that ADT is not entitled to relief and the motion for summary judgment should be denied in its entirety.

Because it appears that material issues of fact exist with regard to whether CFU's employees had actual and/or apparent authority to sign the Service Ticket, the Court finds that ADT is not entitled to summary judgment on the issue of the whether the "Limitation of Liability" provision in the ADT Service Ticket was part of the parties' bargain.  As to the validity and enforceability of limitation of liability provisions such as the one at issue here, and whether such provisions apply to losses resulting from gross negligence, the Court finds that ADT is entitled to judgment in its favor on these legal issues.

A.    **The Terms of the Agreement Between CFU and ADT**

The parties do not dispute that a contractual agreement existed.  Rather, the parties dispute whether the limitation of liability clause was a term of the agreement.  "The proper interpretation of

---

[8]Great Northern maintains that an oral implied-in-fact contract existed with regard to ADT's servicing of CFU's alarm system, consisting solely of CFU's acceptance of ADT's offer to service the system and CFU's payment of for those services.

a contract is a question of law to be determined by the court in the first instance." *J.W.S. Delavau, Inc. v. Eastern Am. Transp. & Warehousing, Inc.,* 810 A.2d 672, 681 (Pa. Super. Ct. 2002) (citing *Standard Venetian Blind Co. v. Am. Empire Ins. Co.,* 469 A.2d 563, 566 (Pa. 1983)). Pennsylvania law applies here since the performance of the contract occurred in Pennsylvania. *See Standard Bent Glass Corp. v. Glassrobots OY*, 333 F.3d 440, 444 n.7 (3d Cir. 2003) (citing *Knauer v. Knauer,* 470 A.2d 553, 557-58 (Pa. Super. Ct. 1983)).

As a preliminary matter, the Court notes that this dispute is not governed by Article 2 of the Pennsylvania Uniform Commercial Code, 13 Pa. Cons. Stat. Ann. §§ 2101 *et seq.* (West 1999) ("UCC"), since the agreement between CFU and ADT does not involve the sale of goods. *Turney Media Fuel, Inc. v. Toll Bros., Inc.,* 725 A.2d 836, 840 (Pa. Super. Ct. 1999) ("'[w]hen the transaction involves predominantly the rendition of services, the fact that tangible, movable goods may be involved in the performance of a contract does not bring the contract under the [Uniform Commercial C]ode.'"(quoting *Whitmer v. Bell Tel. Co. of Pa.,* 522 A.2d 584, 587 (Pa. Super. Ct. 1987) (other citation omitted))); *Gee v. Chattahoochee Tractor Sales, Inc.,* 323 S.E.2d 176, 178 (Ga. Ct. App. 1984) (repairs performed on tractor, which included the replacement of engine parts, constituted a service and not a "sale" under the UCC, as the primary purpose of the contract was to repair the vehicle as opposed to the sale of any component part of the engine); *cf. Lobianco v. Prop. Prot., Inc.,* 437 A.2d 417, 419 (Pa. Super. Ct. 1981) (holding that the installation of a burglar alarm system was a sale of goods within the meaning of the UCC, 13 Pa. Cons. Stat. § 2105(a)).

Here ADT did not enter into a contract with CFU to install the security alarm system, but rather, provided maintenance and repair services to CFU's existing security alarm system upon request. When ADT performed such services, it would bill CFU for the cost of its labor and

14

materials. The materials were merely incidental to the repair work performed.  Thus, the Court finds

that the contract between CFU and  ADT involved predominantly the rendition of services and,

therefore, is not governed by Article 2 of the UCC.   Consequently, the Court looks to Pennsylvania

common law, as well as Article 1 of the UCC, which applies to all commercial contracts, not just

contracts for the sale of goods, as controlling the outcome of this dispute.

A contract is enforceable when the parties reach mutual agreement,[9] exchange

consideration,[10] and have set forth the terms of their bargain with sufficient clarity.  *J.W.S. Delavau,*

810 A.2d at 681; *Geisinger Clinic v. DiCuccio,* 606 A.2d 509, 512 (Pa. Super. Ct. 1992) (citing

*Greene v. Oliver Realty Inc.,* 526 A.2d 1192 (Pa. Super. Ct. 1987)).  "An agreement is sufficiently

definite if the parties intended to contract with each other and if a reasonably certain basis exists

upon which a court could grant an appropriate remedy."  *Geisinger Clinic*, 606 A.2d at 512 (citing

*Greene, supra*); *see also J.W.S. Delavau,* 810 A.2d at 681.  The essential terms to a contract include

an offer, acceptance, consideration, and/or mutual agreement.  *See Jenkings v. County of Schuylkill,*

658 A.2d 380, 383 (Pa. Super. Ct. 1995).  Specifically, time or manner of performance, and price

or consideration are essential terms of an alleged bargain, and must be supplied with sufficient

definiteness for a contract to be enforceable. *Lackner v. Glosser,* 892 A.2d 21, 31 (Pa. Super. Ct.

---

[9]Mutual assent or agreement has been defined "simply as an expression of *agreement* between or among parties" which is usually accomplished by an offer and acceptance.  John Edward Murray, Jr., *Murray on Contracts,* § 29 at 60-61 (4th ed. 2001) (footnote omitted; emphasis in original).

[10]Consideration is defined as the "inducement to a contract . . . Some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility, given, suffered, or undertaken by the other."  *Crawford's Auto Ctr., Inc. v. Commw. of Pa.,* 655 A.2d 1064, 1068 n. 8 (Pa. Commw. Ct. 1995) (citing  Black's Law Dictionary at 277-78 (5th ed. 1979); Restatement (Second) Contracts § 71 (1981)).

2006) (citing *Lombardo v. Gasparini Excavating Co.,* 123 A.2d 663, 666 (Pa. 1956)).[11]  In addition, once a contract has been formed, its terms may be modified  as long as the parties mutually agree to the modification and new consideration is provided for the modification  *J.W.S. Delavau,* 810 A.2d at 681 (citing *Corson v. Corson's, Inc.,* 434 A.2d 1269, 1271 (Pa. Super. Ct. 1981)).

Generally, a contract may be express or implied.  An express contract will be found where the parties specifically express the terms of their agreement, either orally or in writing.  *Crawford's Auto Ctr., Inc. v. Commw. of Pa.,* 655 A.2d 1064, 1066 (Pa. Commw. Ct. 1995) (citing Restatement (Second) of Contracts § 4 (1981); other citation omitted).  With an implied contract, the parties' assent and intent to incur an obligation is inferred from their conduct, in light of the surrounding circumstances, including their course of dealing and trade usage.  *Id.* (citing Restatement (Second) of Contracts,  *supra*; other citations omitted); *Martin v. Little, Brown & Co.,* 450 A.2d 984, 987 (Pa. Super. Ct. 1981) (citations omitted).  With regard to an implied contract, "[w]hen a request for a performance is made under circumstances that a reasonable person would infer an intent by the requestor to pay for it, the request amounts to an offer and a contract is created when the performance is rendered." *Feinberg v. Auto. Banking Corp.,* 353 F. Supp. 508, 511-12 (E.D.Pa. 1973).  Thus, CFU's request for service on its security alarm system, from which ADT could reasonably infer that CFU intended to pay for said service, became an enforceable unilateral contract

---

[11]The Court recognizes that the price term does not have to be supplied in the contract for it to be enforceable, as long as the parties have agreed upon a practicable method of determine the price with reasonable certainty, such as through a market standard.  *Feldman v. Google, Inc.,* No. 06-2540, 2007 WL 966011, *9 (E.D.Pa. Mar. 29, 2007) (citing *Portnoy v. Brown,* 243 A.2d 444 (Pa. 1968); other citation omitted).  Nonetheless, this method is not applicable here as there is no evidence that the parties  agreed upon a practicable method of determining the price.

once the requested service was provided by ADT.[12]

Also relevant to this dispute is the definition of an "agreement" under Article I of the UCC:

> "The bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this title (sections 1205 and 2208).   Whether an agreement has legal consequences is determined by the provisions of [Title 13], if applicable; otherwise by the law of contracts (section 1103 relating to supplementary general principles of law applicable)). . . ."

13 Pa. Cons. Stat. Ann. § 1201 (West 1999).  The UCC defines "course of dealing" as a "sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." 13 Pa. Cons. Stat. Ann. § 1205(a); *see also* Restatement (Second) of Contracts § 223 (1981).  The UCC defines "usage of trade" as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question.  The existence and scope of such usage are to be proved as facts.  If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court."   13 Pa. Cons. Stat. Ann.  § 1205(b); *see also* Restatement (Second) of Contracts § 222(1) & (2).  "A course of dealing between the parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement and qualify terms of an agreement."  13 Pa. Cons. Stat. Ann.  § 1205(c); Restatement (Second) of Contracts § § 222(3) & 223(2); *see also J.W.S.*

---

[12]A unilateral contract is a contract where one party makes a promise in exchange for the other party's act or performance.  The actual formation of the contract occurs when the act or forbearance requested by the promisor (CFU) is performed by the promisee (ADT).  *Greene v. Oliver Realty Inc.,* 526 A.2d 1192, 1194 (Pa. Super. Ct. 1987).

*Devanau,* 810 A.2d at 684 (citing 13 Pa. Cons. Stat. Ann. § 1205(c)).

Course of dealing and usage of trade are distinguishable from course of performance, the latter of which refers to a "sequence of conduct between the parties subsequent to formation of the contract during performance of the terms of the contract[,]" and may be used only to interpret a contract. *J.W.S. Devanau,* 810 A.2d at 683-84 (citations omitted).

In the present case, the parties agree that a prior written service agreement for the provision of maintenance and service to CFU's security alarm system did not exist between ADT and CFU. Nonetheless, ADT has been providing service and maintenance to CFU on an as needed basis since taking over the SecurityLink account in August 2001.  This contractual relationship appears to be an implied contract, as it arises mainly from the conduct of CFU and ADT.  This conduct consists of the following.  CFU requests ADT to perform services and receives the benefit of those services, and therefore an implied promise to pay for those services exists; ADT accepts by performing the service to its detriment, and therefore, expects to be compensated for its services.  At the time the service and/or maintenance is performed, the ADT service technician informs CFU of the recommended maintenance/service and obtains authorization from CFU to perform the recommended repairs/service.   The ADT technician then completes a Service Ticket or Authorization Ticket, which includes a description of the service performed or to be performed, the price, *i.e.,* the labor and materials costs associated with that service, and the terms and conditions of that service. The ADT service technician and a representative of CFU both sign the service ticket/authorization ticket.  From the signed ticket, an invoice is generated by ADT for the work performed by its technician and authorized by CFU.  Together, the conduct of ADT and CFU plus the ServiceTicket/Authorization Ticket constitute the entire agreement of the parties.

18

This procedure was followed on at least six occasions,[13] including on November 17-18, 2004. In particular, CFU requested service by placing a telephone call to ADT on November 17, 2004, and ADT responded the next day by sending a service technician, Kevin Ferri, to determine the cause of the "service com failure" warning. During this service call, Mr. Ferri advised Mr. Keber of CFU that the Radionics panel needed to be removed and sent to the manufacturer for repair. Mr. Keber indicated orally his agreement to removing the Radionics panel, after which Mr. Ferri removed the part and then completed a Service Ticket. On the front of the Service Ticket, Mr. Ferri made handwritten notes of the work performed that day and the additional work to be done, the customer's knowledge that the alarm system was inoperable while the part was removed, and an itemization of the labor and materials associated with the service performed on November 18, 2004. At that time, performance was not yet complete, as ADT had to ship the removed part to the manufacturer for repair, and then reinstall it once the repair was completed. After the Service Ticket was completed by Mr. Ferri, he and Mr. Keber signed the Service Ticket. On January 26, 2005, Mr. Ferri returned to CFU and installed the repaired part. On January 27, 2005, ADT issued an invoice for labor and parts associated with its service on November 18, 2004 and January 26, 2005. At no time between November 18, 2004 and January 26, 2005 did CFU object to the terms and conditions set forth on the Service Ticket.

Great Northern takes the position that the Service Ticket was not part of the bargain between CFU and ADT, and therefore, there was no agreement or meeting of the minds as to its terms. Great Northern advances several arguments in support of its position. First, Great Northern submits that

---

[13]The dates of service performed by ADT are January 30, 2003, June 14, 2004, November 18, 2004, June 22, 2005, February 8, 2006, and March 2, 2006. (Ex. B1 to Def.'s App.)

the Service Ticket was not part of the bargained for agreement between the parties because it was

not presented to Mr. Keber until *after* ADT performed its work.   Consequently, the Service Ticket

was not supported by consideration because, according to Great Northern, the consideration

supporting the implied contract was ADT's performance of its work, *i.e.,* servicing the system on

November 18, 2004.  The Court does not find any merit to this argument.  It is clear from the parties'

conduct and the handwritten words on the Service Ticket that the Service Ticket was completed and

signed *at the time of performance*, and indeed, in this particular case, while performance was still

ongoing, as performance was not complete until ADT returned on January 26, 2005 to install the

repaired part.  Further evidence of the continuing performance is the fact that ADT did not issue its

invoice for the service performed until service was complete, *i.e.,* after the repaired part was

installed. Thus, Great Northern's attempt to show the Service Ticket was not part of the bargain,

based on *when* the Service Ticket was presented to CFU, is unavailing.

Additionally, the cases cited by Great Northern in support of its position that the Service

Ticket was not part of the agreement are distinguishable.   First, these cases are from jurisdictions

that are not binding on this Court.  Moreover, in both *Rubin v. AMC Home Inspection & Warranty

Serv.,* and *Olathe Mfg., Inc. v. Browning Mfg.,* the limiting provisions in those cases were clearly not

provided at the time of performance. *See, Rubin v. AMC Home Inspection & Warranty Serv.,* 418

A.2d 306, 311 (N.J. Super. Ct. 1980) (the homeowner and home inspection company entered into

a written agreement for a home inspection which did not include the exculpatory provisions, but the

subsequent inspection report provided after completion of the inspection included the exculpatory

provisions); *Olathe Mfg., Inc. v. Browning Mfg.,* 915 P.2d 86, 95 (Kan. 1996) (limitation of remedies

provision contained in manufacturer's catalog did not become part of basis of bargain where

purchaser did not purchase item directly from manufacturer but from distributor, brochure provided by distributor did not refer to remedy limitation in catalog, and purchaser did not receive the catalog at time it was negotiating sale). Finally, in *LWT, Inc. v. Childers,* a question of fact existed as to whether the purchaser possessed or received a catalog containing the manufacturer's warranty prior to the sale. *LWT, Inc. v. Childers,* 19 F.3d 539, 541-42 (10th Cir. 1994) (citations omitted) ("A limited warranty contained in a manufacturer's catalog may be considered part of the basis of the parties' bargain, so long as the purchaser received the catalog and had an opportunity to read the warranty, . . . prior to or at the time of the sale[.]").  In fact, the holding in *LWT* appears to support ADT's position not that of Great Northern, as CFU received the Service Ticket containing the limitation of liability provision at the time of performance, which was adequate under the court of appeals' holding in *LWT* to consider the provision part of the parties' bargain.

Next, Great Northern contends that the terms of the Service Ticket were never mentioned, discussed, negotiated, or bargained for between CFU and ADT.  Moreover, Great Northern contends that CFU had absolutely no knowledge of the limitations contained on the reverse side of the Service Ticket, let alone agreed to those terms.   Because CFU lacked such knowledge, Great Northern argues it is impossible to conclude that any of the limitation provisions were part of the consideration for the contract or basis of the bargain between CFU and ADT.  At a minimum, Great Northern submits that material issues of fact exist as to these points thus precluding entry of summary judgment.  The Court disagrees with Great Northern.

The record evidence shows that CFU and ADT clearly discussed and/or negotiated the essential terms contained in the Service Ticket.  Specifically, Mr. Ferri and Mr. Keber discussed the repair work that needed to be performed on the Radionics panel, and came to a verbal agreement as

to the course of action to be taken by ADT.  This oral agreement was then reduced to writing on the Service Ticket, which indicated the work to be performed, the authorization to perform the work, that the customer understood the system would be inoperable while the Radionics panel was removed for repair, and the price for the labor and materials expended on November 18, 2004.  Thus, as to these essential terms, the undisputed evidence shows there was a mutual agreement by the parties.  Thus, the question remains whether there was a mutual agreement regarding the "Limitation of Liability" provision.

Pennsylvania law follows the objective theory of contracts and therefore, looks to the parties' outward manifestations in determining whether they agreed to the terms of the agreement.  *Argo Welded Prod., Inc. v. J.T. Ryerson Steel & Sons, Inc.,* 528 F. Supp. 583, 592 (E.D.Pa. 1981) (citing *Beliron Constr. Co. v. Potomac Ins. Co.,* 326 A.2d 499 (Pa. Super. Ct. 1974); other citation omitted).  As the Pennsylvania Supreme Court explained in *Westinghouse Elec. Co. v. Murphy, Inc.*:

> The existence of a contractual term may be shown by the acts of the parties as well as precise words, where to do so would not violate the words used in a contract, see *Yezbak v. Croce,* 370 Pa. 263, 266, 88 A.2d 80, 81 (1952); 3 Corbin, Contracts § 556 (1960).  Especially if evidence of the contract is not an integrated document, and, moreover, one partly or wholly composed of oral communications, the precise content of which is not of record, courts must look to surrounding circumstances and the course of dealings between the parties, *Silverstein v. Hornick,* 376 Pa. 536, 103 A.2d 734 (1954), to ascertain the intention of the parties.

228 A.2d 656, 659 (Pa. 1967) (footnote omitted).[14]  Resolution of this issue ordinarily requires

---

[14]The contract which gave rise to the lawsuit in *Westinghouse Electric* was one where the service provider began performing work pursuant to oral negotiations *prior* to the issuance of the purchase order.  In a letter confirming the oral negotiations, the service provider represented that it was fully covered with insurance for workers compensation, liability and property damage.  *Id.* Westinghouse orally accepted the terms of the service provider's confirmation letter and work began immediately.  Subsequently, Westinghouse issued a purchase order for the negotiated

findings of fact which would preclude entry of summary judgment.  *Argo Welded Prod.,* 528 F.

Supp. at 592 (citation omitted).  However, "it is hornbook law that a party who signs a standard

printed form agreement is bound by its terms absent any countervailing public policy

considerations."  *Id.*  (citing J. Calimari & J. Perillo, *Contracts,* at 328-29 (1977); *Montgomery v.*

*Levy,* 177 A.2d 448, 450 (Pa. 1962) (other citation omitted)); *see also Jim Dan, Inc. v. O. M. Scott*

*& Sons Co.,* 785 F. Supp. 1196, 1200 (W.D.Pa. 1992) ("Absent an allegation of fraud or

incompetence, a person has a duty to read the contract before signing it, and failure to do so will not

excuse ignorance of the contract's terms." (citing *Stanley A. Klopp, Inc. v. John Deere Co.,* 510 F.

Supp. 807, 811 (E.D.Pa. 1981), *aff'd* 676 F.2d 688 (3d Cir. 1982))).

      In the record before the Court, CFU and ADT are clearly private business entities who are

---

work, but the record did not show that the service provider signed the acknowledged copy and
returned it to Westinghouse. The service provider in *Westinghouse Electric* sought to avoid
liability by arguing that its contract never included the appendix, contending that the specific
terms of the contract were fixed when Westinghouse orally accepted its bid as contained in the
written confirmation letter.  According to the service provider, the  inclusion of the appendix
after that point would be considered a modification which would have to be supported by new
consideration.  *Id.* at 659 (footnote omitted).  The Pennsylvania Supreme Court rejected the
service provider's argument, finding that the fact that there was no evidence showing explicit
reference to the appendix in the parties' negotiations prior to the issuance of the purchase order
did not preclude it from concluding that the appendix was included in the agreement.  *Id.*  In
reaching this conclusion, the Pennsylvania Supreme Court looked to the surrounding
circumstances including the course of dealings between the parties to determine their intent and
concluded that there was little doubt that Westinghouse intended this particular contract to
include the appendix (with the indemnification clause) and that the service provider assented to
it.  *Id.* at 659.  Notwithstanding the lack of a signed acknowledgment of the purchase order, the
court found that the service provider's assent to the inclusion of the appendix was indicated by
the "statement in its [confirmation] letter . . .  that it was 'fully covered' with insurance coupled
with the fact that it had obtained insurance covering the contingency which actually occurred[,]"
and the fact that the service provider accepted without objection the purchase order form and
subsequently referenced the work performed pursuant to the purchase order on the invoice it
submitted to Westinghouse for payment.  *Id.*  Thus, the court concluded that the indemnification
clause was part of the agreement between the parties for this particular job.

familiar with service agreements used in the security business.  Therefore, CFU cannot claim surprise or disadvantage in bargaining power amounting to either an unconscionable contract or contract of adhesion.  The circumstances surrounding the agreement between ADT and CFU fail to establish a public policy interest was involved, an unconscionable contract or a contract of adhesion. Therefore, Mr. Keber's signature on the Service Ticket, objectively considered, evidences CFU's consent to the terms and conditions on the Service Ticket, including the "Limitation of Liability" provision, assuming Keber had apparent authority to bind CFU.[15]

Other objective evidence of the parties' intent to include a limitation of liability provision in their agreement is their prior course of dealing and the usage of such provisions in the security alarm business.  ADT raises this very argument in its brief, and offers in support the Service Tickets and/or Authorization Tickets for six different service calls which are substantially similar with regard to the procedure followed and the terms and conditions contained on the Service Tickets/Authorization Tickets.  However, only two of these tickets can actually be used to show prior course of dealing between CFU and ADT, as the other three tickets were issued during service calls occurring subsequent to the November 18, 2004/January 26, 2005 service call.  With regard to trade usage, ADT submits  that limitation of liability provisions are regularly observed and accepted in alarm service contracts  and therefore justify an expectation that the "Limitation of Liability" provision contained in ADT's Service Tickets would be observed.  In support, ADT provides

---

[15]As explained in Part B *infra*, however, a material issue of fact exists as to whether ADT's belief, that CFU's employees, in particular, Mr. Keber, had apparent authority to agree to the Terms and Conditions on the reverse side of the Service Ticket on behalf of CFU, was reasonable.

citations to case law[16] which recognized the use of such provisions in the security alarm industry, as well as the prior service agreements between ADT's predecessors and CFU, as evidence that such provisions are regularly observed in security alarm service contracts and that CFU was aware of such custom/usage in the security alarm business.  Great Northern has failed to address this argument in its response and brief in opposition to summary judgment.

Although the existence of a prior course of dealing between the parties and/or usage of trade is usually an issue of fact for the jury, where one party has not contested the material facts of its prior course of dealing, the courts may find, as a matter of law, that a course of dealing existed.  *Well Luck Co., Inc. v. F. C. Gerlach & Co., Inc.,* 421 F. Supp. 2d 533, 540 (E.D.N.Y. 2005) (citing *Capitol Converting Equip., Inc. v. LEP Transp., Inc.,* 965 F.2d 391, 395 (7th Cir. 1992)).    Many courts have addressed the issue of whether the parties' prior course of dealing and/or trade usage is sufficient to show that the parties intended to incorporate limitation of liability,  warranty, or arbitration clauses in their agreements. The courts have granted motions for summary judgment when the evidence established a prior course of dealing between the parties.  *See, e.g., Valhal Corp.,* 44 F.3d at 201 (prior course of dealing, consisting of  negotiations, several  written proposals which included limitation of liability clause, and revisions which did not eliminate the limitation, established consent to limitation of liability provision even though final version of contract was not signed, but approval given in separate letter); *Westinghouse Elec. Co. v Murphy, Inc.,* 228 A.2d at 659 (prior course of dealing established where parties contracted to provide maintenance service on over 80 occasions

---

[16]For example, Plaintiff cites *Neuchatel Ins. v. ADT Sec. Sys., Inc.,* No. 96-5396, 1998 WL 966080 (E.D.Pa. Nov. 5, 1998) (Pollak, S.J.); *Valhal Corp. v. Sullivan Assoc., Inc.,* 44 F.3d 195 (3d Cir. 1995); and *Royal Indem. Co. v. Sec.  Guards, Inc.,* 255 F. Supp. 2d 497 (E.D.Pa. 2003).

in six years using purchase orders which incorporated terms and conditions through reference to an attached appendix); *Gov't of United Kingdom of Great Britain & N. Ireland v. Northstar Serv., Ltd.,* 1 F. Supp. 2d 521, 524 (D.Md. 1998) (prior course of dealing, consisting of at least 100 transactions between the parties where terms and conditions appeared on every invoice without any affirmative exclusionary provision, established that the invoice terms and conditions were part of contract); *Well Luck,* 421 F.Supp. 2d at 540-41 (evidence that parties conducted over 150 transactions involving invoice containing copy of terms and conditions of service, including limitation of liability provision, was legally sufficient to establish a course of dealing between parties limiting defendant's liability to $50); *Capitol Converting Equip.,* 965 F.2d at 395-96 (parties' prior course of dealing on hundreds of occasions, involving receipt and payment of invoices which all included limitation of liability provisions, supplemented their oral contract which was silent as to limitation of liability); *but cf. Argo Welded Prod.,* 528 F.Supp. at 592 (declining to find that limitation of liability was incorporated into parties' agreement based solely on prior course of dealing on at least five prior occasions during which standard printed delivery receipts containing limitation of liability clause were issued to purchaser and signed by its agent, who admitted that he was familiar with the form, but finding a binding agreement based on signature of agent); *Kunststoffwerk Alfred Huber v. R.J. Dick, Inc.,* 621 F.2d 560, 564-65 (3d Cir. 1980) (recognizing that course of dealing may establish limitation of damages as part of parties' bargain in fact, but finding record was devoid of any evidence to establish a prior course of dealing between parties).

With regard to establishing trade usage, the Court of Appeals held in *Posttape Assoc. v. Eastman Kodak Co.,* 537 F.2d 751, 758 (3d Cir. 1976), that a partnership's knowledge of use of limited liability clauses in particular trade could be established through a partner's deposition

26

testimony that he knew of the trade usage and through evidence that partnership purchased liability insurance coverage for the type of loss that actually occurred. In that case, the vendor argued on appeal that the trial court erred in excluding this evidence during trial, and the court of appeals agreed. On remand, on the issue of whether a trade usage had been established, the trial court noted that repeated applications of the liability limitation would be one way in which to establish "regularity of observance," but a "showing of industry wide recognition and acceptance of such a practice would also suffice." 450 F. Supp. 407, 410 (E.D.Pa. 1978). The trial court found that although there was no evidence of specific implementations of the limitation, abundant testimony existed to the effect that usage of a liability limitation did exist and was accepted by film makers, manufacturers, and processors.[17] *Id.* The trial court concluded that this evidence was sufficient to support the jury's finding that at the time of the sale, a trade usage existed limiting a commercial buyer's remedy to replacement of the negligently manufactured product. *Id.*

Here, the Court finds the uncontested evidence in the record shows that the parties contracted for service on at least two prior occasions which included a signed Service Ticket containing a "Limitation of Liability" provision. The evidence further shows that the written service agreements entered into between CFU and Rollins clearly included limitation of liability provisions almost identical to the one at issue here. Moreover, CFU obtained insurance coverage to protect its property in the event a loss occurred such as the one that actually occurred here, which indicates CFU knew about the limitation liability provision in its service agreements. *Posttape,* 537 F.2d at

---

[17]The evidence as to trade usage at trial in *Posttape* included the testimony of defendant's employees, a film maker, a film processor, and insurance agent, who all testified that it was customary in the film industry for the manufacturer to limit is liability to the replacement of the faulty film. 450 F. Supp. at 409.

758. This evidence stands in stark contrast to a single affidavit from the current national secretary/treasurer of CFU, Edward Pazo, who states that at no time was he presented with or shown the Terms and Conditions set forth on the reverse side of the November 18, 2004 Service Ticket, or on any Service Tickets provided by ADT either prior or subsequent to November 18, 2004, nor was he ever made aware of these Terms & Conditions by ADT or anyone else.  (Pazo Aff. ¶¶ 11 & 12.) These statements by Mr. Pazo, when viewed in the light most favorable to Great Northern, at most, raise an issue of fact as to Mr. Pazo's/CFU's knowledge of the "Limitation of Liability" clause in ADT's Service Tickets.  However, Mr. Pazo's lack of *actual* knowledge of the "Limitation of Liability" provision cannot be foraged into a triable issue of fact as to whether he/CFU should have been aware of the regularly observed practice in the security alarm business to include such provisions in service contracts, as none of his statements in his affidavit can be construed as addressing this point. *Cf. Capitol Converting Equip., Inc. v. LEP Transport, Inc.,* 750 F. Supp. 862, 867 (N.D. Ill. 1990) (finding that corporate president's statement in his affidavit that neither he nor any other employee at corporation ever read or was aware of the terms on the reverse side of invoices, while raising a factual dispute as to whether corporation was *actually* aware of the limitation of liability provision, did not speak to the issue of constructive knowledge, and therefore, was insufficient to create a genuine factual dispute over whether a course of dealing as to liability limitation existed between parties, where record contained detailed and uncontested evidence of parties' extensive business history), *aff'd* 965 F.2d 391, 395 & n. 6 (7th Cir. 1992).  Moreover, Great Northern completely fails to address ADT's argument regarding prior course of dealing and/or trade usage, which the Court interprets as conceding this point.

Accordingly, the Court finds that the uncontroverted evidence of the inclusion of limitation

of liability provisions in the service contracts between ADT's predecessors and CFU, the procurement and maintenance of insurance coverage by CFU for the risk/loss that actually occurred, and the existence of two prior signed Service Tickets, together, provide additional objective evidence of CFU's consent to the "Limitation of Liability" provision contained in the November 18, 2004 ADT Service Ticket.

In light of this conclusion, the Court likewise rejects Great Northern's argument that the Service Ticket constitutes a  modification to the contract which requires the parties' assent and additional consideration, both of which are lacking.  Great Northern's argument is predicated on the position that the terms and conditions of the contract between CFU and ADT were set and defined when CFU requested ADT to service its system.  This position is contrary to general contract law. Mutual agreement does not occur until there has been an offer *and* acceptance.  *Murray on Contracts, supra,* at 60-61.  In any event, as explained above, all of the terms of the Service Ticket were part of the bargained for agreement between CFU and ADT.

### B.    Actual and/or Apparent Authority of CFU Officers/Employees

Notwithstanding this conclusion, a question remains as to whether CFU's employees had the authority to agree to the Terms and Conditions contained on the ADT Service Tickets, in particular, the one dated November 18, 2004.  In response to ADT's motion for summary judgment, Great Northern submits that CFU's employees, Robert Keber and Mark Hile, did not have the authority to contractually bind CFU or to enter into any contracts on its behalf, including the Terms and Conditions contained on the reverse side of the November 18, 2004 Service Ticket.[18]  In support of

---

[18]Great Northern raised this argument in its challenge to the enforceability of the limitation of liability provision on the basis that it is a contract of adhesion.  (Pl.'s Br. at 22-23).

its position, Great Northern submits the affidavit of the Secretary/Treasurer of the national CFU, Edward Pazo, as well as the affidavits of CFU employees, Robert Keber and Mark Hile.

In their affidavits, Keber and Hile state that they are not authorized to enter into any contract or otherwise bind CFU in any contractual relationship, they had no authority to agree to the Terms and Conditions on the ADT Service Tickets, nor have they ever represented to Ferri or anyone else from ADT or its related companies that either of them had the power and authority to bind CFU in any type of contract, including any contract with ADT.  (Keber Aff. ¶¶  4, 15,17; Affidavit of Mark Hile ("Hile Aff."), ¶¶ 4, 9, 11 (Ex. D in Pl.'s App.).)  Keber and Hile further state that they were not aware of the Terms and Conditions contained on the reverse side of the Service Tickets, and had they been shown the Terms and Conditions, they would not have signed the Service Tickets.  (Keber Aff. ¶ 20; Hile Aff. ¶ 14.)  In addition, Keber and Hile aver that they are authorized to sign service tickets from vendors after completion of work to verify that the vendor performed the work, and that their signatures on the front of the ADT Service Tickets acknowledged that ADT technician performed the service.  (Keber Aff. ¶¶ 6, 16; Hile Aff. ¶¶ 5, 10.)  With regard to the November 18, 2004 ADT Service Ticket, Keber stated that his signature on that ticket acknowledged merely that Ferri inspected the Radionics panel and removed it for repairs.  (Keber Aff. ¶ 16.)  Mr. Pazo's statements in his affidavit support the statements of Keber and Hile, in that he avers that only  the Executive Board of CFU has the authority to approve and sign contracts on behalf of CFU.  (Pazo Aff. ¶ 5.) Pazo further states that Keber did not have authority to enter into any contract on behalf of CFU or contractually bind it in any way, nor did he or the Executive Board authorize Keber to enter into any contract with ADT or to otherwise bind CFU to any contractual terms and conditions presented by ADT.  (Pazo Aff. ¶¶ 9, 10, 13, 14.)

30

In its reply brief, ADT argues that it reasonably believed that Keber had apparent authority to enter into the agreement on behalf of CFU. In support of this argument, ADT submits that Keber was the main contact at CFU with regard to service and maintenance of the security alarm system. Keber would request service calls, and discuss the problems and concerns with the ADT technician. ADT also proffered Ferri's affidavit in support of its position.[19]   Thus, ADT maintains, the words and conduct of CFU and Keber communicated to ADT that CFU was agreeing to all of the terms and conditions contained in the November 18, 2004 Service Ticket.  (Def.'s Reply Br. at 8-9.)

Under Pennsylvania law, an agent can bind its principal based on express (actual) authority or apparent authority.[20]  *Bolus v. United Penn Bank,* 525 A.2d 1215, 1221 (Pa. Super. Ct.1987) (citation omitted); *Penn City Investments, Inc. v. Soltech, Inc.,* No. 01-5542, 2003 WL 22844210, * 14 (E.D.Pa. Nov. 25, 2003) (citation omitted).  Express or actual authority is "authority directly granted by the principal to bind the principal as to certain matters." *Bolus,* 525 A.2d at 1221. "Apparent authority exists where a principal, *by words or conduct,* leads people with whom the alleged agent deals to believe that the principal has granted the agent authority he or she purports to exercise." *Turner Hydraulics, Inc. v. Susquehanna Constr. Corp.,* 606 A.2d 532, 534 (Pa. Super. Ct. 1992) (citation omitted; emphasis in original).  In determining the apparent authority of an agent, the court must focus on the actions of the principal, not the agent.  *Bolus,* 525 A.2d at 1222 (citations

---

[19]Ferri states in his affidavit that Keber and Hile represented to him that they had the power and authority to bind CFU in contract.  (Ferri Aff. ¶¶ 3-4.)  Ferri further stated that at no time following November 18, 2004 has anyone at CFU engaged in any conduct to refute his understanding regarding Keber's and Hile's authority to act on behalf of CFU, or to advise him to the contrary.  (Ferri Aff. ¶ 4.)

[20]There are two other bases for establishing an agency relationship, neither of which are relevant to this dispute.  *Bolus,* 525 A.2d at 1221.

omitted); *Penn City Investments,* 2003 WL 228442210, at * 14 (citation omitted).  If the third party

has actual knowledge of the limits of the agent's authority, the third party cannot rely on the agent's

apparent authority to bind the principal.  *Bolus,* 525 A.2d at 1222; *see also Universal Computer Sys.,*

*Inc. v. Med. Serv. Ass'n of Pa.,* 628 F.2d 820, 823 (3d Cir. 1980) (citing *Schenker v. Indem. Ins. Co.*

*of N. Am.,* 16 A.2d 304, 306 (Pa. 1940)).  Without that actual knowledge, however, the third party

is required to exercise only reasonable diligence to ascertain the agent's authority.  *Bolus,* 525 A.2d

at 1222  (citation omitted).  As explained by the Pennsylvania Superior Court:

> The third party is entitled to believe the agent has the authority he
> purports to exercise only where a person of ordinary prudence,
> diligence and discretion would so believe.  Thus, a third party can rely
> on the apparent authority of an agent when this is a reasonable
> interpretation of the manifestations of the principal.

*Id.* (internal citations omitted).

Ordinarily, the nature and extent of an agent's authority presents a question of fact for the

jury.  *Bolus,* 525 A.2d at 1221 (citations omitted); *Turner Hydraulics,* 606 A.2d at 534-35 (citing

*Bolus, supra*; other citations omitted); *see also AMCO Ukrservice v. Am. Meter Co.,* 312 F. Supp.

2d 681, 696 (E.D.Pa. 2004) (whether apparent authority exists in a given case is almost never

resolved on summary judgment because this issue turns closely on both the principal's

manifestations and the reasonableness of the third party's beliefs (citing *Gizzi v. Texaco, Inc.,* 437

F.2d 308, 310 (3d Cir. 1971))).  Where, however, the facts relating to the nature and existence of the

agency relationship are not contested, the court may properly decide the issue.  *Penn City Inv.,* 2003

WL 22844210, at * 14 (citation omitted).  In ascertaining whether apparent authority exists, the

factfinder must evaluate the conduct of the parties in light of all the circumstances.  *Turner*

*Hydraulics,* 606 A.2d at 535 (citations omitted).  Moreover, apparent authority may be gleaned from

a course of dealing or a single transaction.  *Id.* (citations omitted).

Turning to the facts of this case, the evidence shows that there was no written service contract governing the relationship between CFU and ADT, and Keber was the main contact between CFU and ADT for all service and maintenance related issues.  However, as to the remaining facts surrounding the express and apparent authority of Keber and Hile, and what, if anything Ferri/ADT knew about the limits of their authority, the parties and their evidence disagree.  Although Great Northern does not address ADT's apparent authority argument head on,[21] the affidavits of Pazo, Keber and Hile do contain statements regarding the authority of Keber and Hile and their representation of that authority to Ferri, which conflicts with ADT's evidence.  Moreover, there is no evidence of what measures, if any, ADT took to ascertain Keber's authority, and ADT fails to specifically identify the manifestations of CFU's Executive Board that lead ADT to reasonably believe Keber had apparent authority.

Therefore, viewing the evidence in the light most favorable to Great Northern, the Court concludes that material issues of fact remain as to express and apparent authority of CFU's employees, and as to whether ADT reasonably believed CFU's employees had apparent authority to agree to the terms and conditions contained in the November 18, 2004 Service Ticket. Accordingly, the Court finds ADT is not entitled to summary judgment on the issue of whether the

---

[21]Great Northern has not responded to ADT's argument that it reasonably believed that Keber had apparent authority to agree to the terms and conditions contained in the Service Ticket, perhaps because ADT's argument was raised in its reply brief in response to Great Northern's argument regarding actual authority.  However, Great Northern could have requested leave to file a sur reply to address ADT's apparent authority argument, which the Court would have granted.  In any event, the evidence offered in support of and in opposition to the motion for summary judgment has raised a material issue of fact for the jury as to the express and/or apparent authority of CFU's employees.

"Limitation of Liability" provision is included in the parties' bargain.

### C.    Limitation of Liability Clause is Enforceable

Notwithstanding the Court's finding that a material issue of fact remains as to whether the "Limitation of Liability" provision was part of the parties' bargain, the Court will proceed, nonetheless, to address the enforceability of the "Limitation of Liability" provision, as it presents purely a legal question, the resolution of which will aid the parties in narrowing the issues for trial.

In the event the "Limitation of Liability" provision is deemed to be part of its agreement with CFU, ADT submits that said limitation is enforceable, as limitations of liability have been routinely upheld by the Pennsylvania courts in sales contracts of varying types. Applying the three part test enunciated by the Pennsylvania Supreme Court in *Employer's Liab. Assurance Corp., Ltd. v. Greenville Bus. Men's Ass'n,* 224 A.2d 620, 623 (Pa. 1966), to the facts here, ADT contends that the limitation of liability provision: (1) does not violate public policy; (2) is part of a contract between private parties and relates solely to their private affairs; and (3) is not a contract of adhesion. Moreover, ADT submits that contracts between two commercial entities are rarely found unconscionable, and in any event, CFU cannot claim surprise here. Finally, ADT contends that although Article 2 of the UCC does not apply to the service contract at issue here, the "Limitation of Liability" provision does, nonetheless, meet the requirements of UCC § 2719. In support of its argument, ADT cites a plethora of case law from Pennsylvania and the Third Circuit.

In response, Great Northern counters that the "Limitation of Liability" provision: (a) violates the law and public policy because a reasonable jury could conclude the losses sustained were proximately caused by ADT's alleged violation of the International Building Code and International

Fire Code (the "Codes"), which are designed to protect public safety;[22] and (2) constitutes a contract of adhesion as the pre-printed terms and conditions on the reverse side of the Service Ticket were not negotiable, which CFU was powerless to change, and had CFU been given an opportunity to object to the terms and conditions before ADT performed its work, CFU would have rejected the transaction entirely.  In addition, Great Northern argues that the "Limitation of Liability" provision was contained in boilerplate language which was inconspicuously written on the back of the Service Ticket in uniform print that did not identify itself as exculpatory language, or otherwise stand out from any of the language on the reverse side of the pre-printed form.  Great Northern further contends that the "Limitation of Liability" provision which appears in small type, closely spaced lines, lacks a caption or heading in boldface type at the top, but includes a caption which is in type identical to the rest of the paragraph in both font and form, completely fails to attract attention to the "Limitation of Liability" provision, and such failure is fatal to finding said limitation enforceable. In support of its position, Great Northern relies primarily on *Moscatiello v. Pittsburgh Contractors Equip. Co.,* 595 A.2d 1190 (Pa. Super. Ct. 1991).

In reply, ADT states that the Pennsylvania and federal courts have upheld and enforced limitation of liability provisions as a matter of course between an individual or corporation and security monitoring companies in cases involving fires, water damage, and burglaries.  In support, ADT cites *Neuchatel Ins. v. ADT Sec. Sys., Inc.,* No. 96-5396, 1998 WL 966080 (E.D.Pa. Nov. 5,

---

[22]The Court finds no merit to this argument, essentially for the reasons set forth in ADT's reply brief.  In addition, "[i]n order for a contractual provision to violate public policy the provision must involve a matter of interest to the public or state."  *Valhal Corp.*, 44 F.3d at 206 (citing *Seaton v. Easton Windsor Speedway, Inc.,* 582 A.2d 1380, 1382 (Pa. Super. Ct. 1990)). Since the International Building and Fire Codes do not apply to ADT, and the contract between ADT and CFU is a private matter between private parties, there is not public interest involved here.

1998); *Folkman v. Baker Prot. Serv., Inc.*, No. 91-1689, 1993 WL 106460 (E.D.Pa. Apr. 5, 1993).

Addressing Great Northern's public policy argument, ADT specifically states that Great Northern's

perceived contravention of public policy is misplaced and the cases upon which it relies are

irrelevant. ADT argues that duties and obligations under building and fire codes are imposed on the

owners of the building, unless otherwise agreed to by the parties. *Gnarra v. Dep't of Labor & Indus.*

*Indus. Bd.,* 658 A.2d 844 (Pa. Commw. Ct. 1995); *Balent v. City of Wilkes-Barre,* 669 A.2d 309 (Pa.

1995). ADT submits that there is no evidence here that it assumed any duties or obligations under

the building codes. Moreover, the International Building Code defines "owner" as "any person,

agent, firm or corporation having a legal or equitable interest in the property." (Def.'s Reply Br., Ex.

A.) The International Fire Code defines "owner" as an entity or person "who has legal title to any

structure or premises . . . , and shall include the duly authorized agent or attorney, a purchaser,

devisee, fiduciary and any person having a vested or contingent interest in the premises in question."

(Def.'s Reply Br., Ex. B.) ADT contends it does not meet either definition of "owner." As to Great

Northern's argument that the agreement constitutes a contract of adhesion, ADT characterizes

Plaintiff's argument as "specious," contending that the federal courts in the Third Circuit have

reviewed the same contract and limitation of liability, and held it to be enforceable. In support, ADT

cites *Neuchatel*, *supra.* Finally, ADT distinguishes the *Moscatiello,* upon which Great Northern

relies, on the basis that the parties had no prior dealings, the disclaimer of warranties at issue was

found to have violated the Pennsylvania UCC, and the language of the limitation of liability was

inconspicuous.

　　　　As explained below, none of Great Northern's arguments in opposition to enforcing the

"Limitation of Liability" provision have any merit. Moreover, Great Northern's reliance on

*Moscatiello* is misplaced because, as ADT correctly notes, that case is factually distinguishable from the case at bar.[23]

For the most part, the parties' arguments and cases cited in support thereof track the requirements for evaluating the enforceability of exculpatory clauses in Pennsylvania, however, the Pennsylvania courts and Third Circuit have held that different standards apply when dealing with exculpatory clauses as opposed to limitation of liability clauses. *See Valhal Corp.,* 44 F.3d at 202 (citing *DeFrancesco v. W. Pa. Water Co.,* 478 A.2d 1295, 1306 (Pa. Super. Ct. 1984); *Posttape,* 537 F.2d at 755). Thus, those cases which involve the enforcement of exculpatory clauses are simply

---

[23]Although the distinctions in *Moscatiello* noted by ADT are correct, there are other distinctions that are more significant to the Superior Court's resolution of the issues. For example, *Moscatiello* involved the enforceability of both a disclaimer of warranties provision and limitation of remedies provision. 595 A.2d at 1194-95. These provisions were contained in a written sales contract (albeit a standard purchase agreement) for the sale of goods and thus were subject to Article 2 of the UCC. Section 2316(b) which governs a disclaimer of warranties and requires that the disclaimer be conspicuous, does not apply to limitation of remedy provisions, which are governed by Section 2719. *See Borden, Inc. v. Advent Ink Co.,* 701 A.2d 255, 264 (Pa. Super. Ct. 1997) (holding that there was no requirement under Article 2 of the UCC that limitation of liability provision contained in a contract for the sale of goods must be conspicuous (citing *Jim Dan, Inc. v. O.M. Scott & Sons Co.,* 785 F. Supp. 1196 (W.D.Pa. 1992))). Nonetheless, the court in *Moscatiello* appears to have imposed the conspicuous requirement on the limitation of liability provision in that case, in determining whether the limitation was unconscionable. 595 A.2d at 1196-97. Also significant to the Superior Court's decision was the fact that neither the owner nor superintendent of the construction company was a dealer in the type of equipment purchased or in any type of heavy equipment, neither had dealt with this particular vendor previously, and neither had any knowledge of the standard contracts or business practices of this vendor. *Id.* at 1196. Thus, the court found that the construction company was not a merchant or experienced business concern and therefore a disparity in bargaining power/sophistication existed between the parties. *Id.* at 1196-97. Unlike *Moscatiello,* the CFU Executive Board had previously entered into security service contracts with ADT's competitors involving the same limitation of liability provision, and CFU's maintenance employees had previously signed service tickets containing the same or similar terms and conditions from ADT and its predecessors before November 18, 2004, and from ADT after that date. Notwithstanding that Article 2 of the UCC does not apply to this case, the language in the ADT Service Ticket is not inconspicuous. Therefore, the reasons for finding the limitation of liability provision in *Moscatielli* unenforceable simply do not exist in the case at bar.

inapposite here.  *See, e.g., Employer's Liab. Assurance Corp.,* 224 A.2d at 623. Nor does Section

2719 of the UCC apply.   Instead, Pennsylvania common law controls the enforceability of the

"Limitation of Liability" provision here and makes  clear that said limitation is valid and

enforceable.  *Lobianco,* 437 A.2d at 420-21 (although case involved a sale of goods under Article

2 of UCC, court found § 2719(c) not applicable and therefore applied Pennsylvania common law in

holding that a limitation of liability provision in contract for installation of security alarm system

limiting liability to cost of repairs was enforceable, and noting clauses limiting liability in security

alarm cases have uniformly been upheld in non-UCC cases); *Wedner v. Fidelity Sec. Sys., Inc.*, 307

A.2d 429, 432 (Pa. Super. Ct. 1973) (holding in contract for burglar alarm system, limitation of

liability provision as to damages resulting from vendor's own negligence was enforceable and not

against public policy or unconscionable where agreement was between two private businesses, and

plaintiff had 20 years experience with similar provisions in similar service contracts with a

competitor of the defendant); *Magar v. Lifetime, Inc.,* 144 A.2d 747, 748 (Pa. Super. Ct. 1958)

(holding limitation of liability provision limiting damages to replacement or correction of defective

material and/or installation in service contract for improvements to plaintiff's residence was valid

and enforceable (citing Restatement of Contracts § 339 cmt. g; other citations omitted[24])); *Behrend*

*v. Bell Tel. Co. of Pa.,* 363 A.2d 1152, 1164 & n.16 (Pa. Super. Ct. 1976) (limitation of liability

provisions in private contracts between telephone company and customer for listings and advertising

in yellow pages directory are routinely enforced), *vacated on other grounds* 374 A.2d 536 (Pa. 1977),

*rev'd and remanded in accordance with prior opinion,* 390 A.2d 233 (Pa. Super. 1978); *Vasilis v.*

---

[24]By way of analogy, the Superior Court also cited Section 2-719 of the UCC.  144 A.2d
at 748.

*Bell of Pa.,* 598 A.2d 52, 54 (Pa. Super. Ct. 1991) (enforcing limitation of liability provision in private contract between business customer and telephone company for listings in yellow pages and rejecting customer's argument that agreement was a contract of adhesion); *Valhal Corp.,* 44 F.3d at 203-04 (noting that limitation of liability clauses have been routinely enforced under UCC as well as in contracts not governed by UCC (citing *Lobrianco*, *Wedner*, *Magar*, *Behrend*, and *Vasilis*, *supra*)).

In *Wedner,* the Pennsylvania Superior Court held there is no doubt as to the legality of a limitation of liability provision in a contract between ordinary business persons. 307 A.2d at 431. As long as the contract provision limiting liability is between private parties and relates entirely to their own private affairs, and does not involve fraud or mistake, the Pennsylvania courts have found such contracts to be valid and enforceable. *Id.* at 431-32 (citing *Dilks v. Flohr Chevrolet, Inc.,* 192 A.2d 682, 687 (Pa. 1963); *Bechtold v. Murray Ohio Mfg. Co.,* 184 A. 49, 51 (Pa. 1936)). The court further noted in *Wedner* that the plaintiff had a choice as to how to protect his property and whether or not to obtain insurance. *Id.* at 432. Finally, the court found that even if this contract was governed by Article 2 of the UCC, the limitation of liability provision was prima facie conscionable. *Id.* Thus, given the plaintiff's prior experience with similar security service contracts and limiting provisions, the court held "'it is clear that the exclusion was not unconscionable here, where the buyer was hardly the sheep keeping company with wolves that it would have us believe.'" *Id.* at 432-33 (quoting *K & C, Inc. v. Westinghouse Elec. Corp.*, 263 A.2d 390, 393 (Pa. 1970)). The Court of Appeals in *Valhal Corp.* aptly summarized Pennsylvania law on limitation of liability provisions:

> We are persuaded that limitation of liability clauses are not disfavored under Pennsylvania law; especially when contained in contracts between informed business entities dealing at arm's length, and there

has been no injury to person or property.  Furthermore, such clauses are not subjected to the same stringent standards applied to exculpatory and indemnity clauses.  Limitation of liability clauses are a way of allocating "unknown or undeterminable risks," and are a fact of everyday business and commercial life.  So long as the limitation which is established is reasonable and not so drastic as to remove the incentive to perform with due care, Pennsylvania courts uphold the limitation.

44 F.3d at 203-04 (citing *K & C, Inc. v. Westinghouse Elec., supra*).

Here, where the agreement between CFU and ADT was a private contract between experienced business concerns, CFU had a choice as to how to protect its property and whether or not to purchase insurance and in fact did obtain insurance from Plaintiff, and the limitation of liability provision does not remove ADT's incentive to perform with due care,[25] the Court finds the "Limitation of Liability" provision contained in ADT's Service Ticket dated November 18, 2004 is reasonable and therefore is valid and enforceable.

Accordingly, the Court finds, as a matter of law, that the "Limitation of Liability" provision contained in the Service Ticket dated November 18, 2004 is enforceable under applicable Pennsylvania law.  Therefore, ADT is entitled to judgment as a matter of law on this issue.

### D.    Scope of the Limitation of Liability Provision

Having determined the "Limitation of Liability" provision is enforceable, one last issue remains regarding the scope of the liability limitation.  The Parties disagree as to whether the language of the  "Limitation of Liability" provision is broad enough to include acts of gross

---

[25]The provision limiting ADT's liability did not render the contract illusory.  ADT does not have the option of escaping from its duty of performance, and CFU remains entitled to performance, *i.e.,* to repair or replace any part of the security system which proves to be defective in material or workmanship, with a new or functionally operative part.  (Limited warranty contained on reverse side of Service Ticket, Ex. B in Def.'s App.)

negligence.  ADT argues that where the language of the limitation of liability clause limits damages to those resulting from "negligence, active or otherwise," the reference to "otherwise" is broad enough to include allegations of gross negligence.  In particular, ADT points out that the language in the ADT Service Ticket perfectly tracks the limitation of liability language at issue in *Neuchatel* and *Home Indemnity Co. v. Nat'l Guardian Sec. Serv. Corp.,* No. 94-4964, 1995 WL 298233 (E.D.Pa. May 11, 1995), and in both of those cases, the district court broadly construed the language "negligence, active or otherwise" to include alleged acts of gross negligence.

On the other hand, Great Northern counters that limitation of liability clauses, which purport to immunize a party from liability for negligence, are to be strictly construed against the party asserting the limitation, citing in support, *Employer's Liability Assurance Corp.,* 224 A.2d at 623. Great Northern further argues that the district courts from this circuit have held that liability for acts of gross negligence were not limited by an exculpatory clause, citing *Douglas W. Randall, Inc. v. AFA Prot. Sys., Inc.,* 516 F. Supp. 1122, 1127 (E.D.Pa. 1981), *aff'd without op.,* 688 F.2d 820 (3d Cir. 1982); *Fidelity Leasing Corp. v. Dun & Bradstreet, Inc.,* 494 F. Supp. 786, 789-90 (E.D.Pa. 1980); and *Stark Co., Inc., v. Nat'l Guardian Sec. Serv.,* No. 89-8880, 1990 WL 112110, * 2 (E.D.Pa. Aug. 3, 1990).  Moreover, Great Northern contends, "'an exemption [from liability] is always invalid if it applies to harm wilfully inflicted or caused by gross or wanton negligence,'" quoting 6A *Corbin on Contracts,* § 1472 at 596-97 (1962).[26]  In this case, Great Northern contends issues of material fact exist as to whether ADT was grossly negligent in servicing CFU's security

---

[26]This quote from *Corbin on Contracts* specifically refers to an *exemption* from liability, not a *limitation* of liability, and therefore, is inapposite here.

41

alarm system.[27]  Accordingly, should a jury find ADT liable based on gross negligence, such liability

will not be limited by the "Limitation of Liability" provision on the ADT Service Ticket, and

therefore, ADT is not entitled to judgment as a matter of law.

In reply, ADT adds only that degrees of negligence are not recognized under Pennsylvania

common law, citing *Fialkowski v. Greenwich Home for Children, Inc.,* 921 F.2d 459, 462 n. 6 (3d

Cir. 1990); and *Ferrick Excavating & Grading Co. v. Senger Trucking Co.,* 484 A.2d 744, 749 (Pa.

1984).

After a close examination of the cases cited by the parties, the Court finds that the reference

to "negligence, active or otherwise" in the "Limitation of Liability" provision contained in the ADT

Service Ticket should be construed to apply to acts of gross negligence.  In reaching this conclusion,

the Court is aware that under Pennsylvania law, provisions that attempt to exempt a party from

liability for negligence are strictly construed;[28] however, this case does not involve an *exemption*

from liability, but rather, a *limitation* of liability.  Thus, as noted by the Third Circuit in *Valhal*

*Corp.,* the same stringent standards developed for exculpatory, hold harmless, and indemnity clauses

---

[27]The actions of ADT which Great Northern alleges constitute gross negligence consist of ADT's failure to install a temporary panel and failure to promptly return the repaired Radionics panel to CFU's premises, despite CFU's alleged repeated requests and inquiries as to the status of the replacement.  (Pl.'s Br. at 26.)  Whether ADT's conduct demonstrates the lack of care required for gross negligence is a question of fact for the jury.  *Royal Indem. Co. v. Sec. Guards, Inc.,* 255 F. Supp. 2d 497, 506 (E.D.Pa. 2003) (citing *Albright v. Abington Mem'l Hosp.*, 696 A.2d 1159, 1164-65 (Pa. 1997); *Stark Co.,* 1990 WL 112110, at * 3).  However, the parties may decide not to present and/or submit the liability issues on the negligence and breach of implied warranty claims to the jury unless the jury first finds in favor of Great Northern on the contract issue.

[28]In Pennsylvania, parties may contractually agree to avoid the consequences of negligent acts but the agreement must articulate the intention of the parties with particularity.  *Posttape,* 537 A.2d at 755 (citing *Employers Liab. Assurance Corp.,* 224 A.2d 620; other citations omitted).

should not be applied to limitation of liability clauses.  44 F.3d at 202 (noting Pennsylvania appellate courts have recognized differences between contracts that insulate a party from liability from those that merely place limits on that liability (citing *DeFrancesco,* 478 A.2d at 1306)).  Indeed, in both of the cases cited by ADT, the district courts examined the language of the limitation of liability provisions, which is identical to the language in ADT's Service Ticket, and concluded that the language, "negligence, active or otherwise" was broad enough to apply to limit liability for gross negligence.  *Neuchatel,* 1998 WL 966080, at *9; *Home Indem. Co.,* 1995 WL 298233,  at * 3.[29] Moreover, in both of those cases, the district courts looked to the decision of the Pennsylvania Superior Court in *Valeo v. Pocono Int'l Raceway, Inc.,* 500 A.2d 492, 493 (Pa. Super. Ct. 1985), wherein the court held that language in an agreement releasing the defendant sponsor of a car race "from all liability . . . for all loss or damage . . . on account of injury to the person or property . . ., whether caused by the negligence of [sponsor] or otherwise," was broad enough to exclude liability for all degrees of negligence, including gross negligence.  In that case, the language was truly exculpatory, as it released the sponsor from all liability, and yet the Superior Court held the exculpatory clause applied to gross negligence.

In *Royal Indem. Co. v. Sec. Guards, Inc.,* 255 F. Supp. 2d 497 (E.D.Pa. 2003), the district court was asked to decide whether language in an indemnification clause, which purported to indemnify the manufacturing company for any bodily injury or property damage loss sustained by

---

[29]The Court notes that the district court's opinion in *Home Indemn. Co.* uses the term "exculpatory" to refer to what is actually a limitation of liability provision.  Many of the decisions involving interpretations of limitation of liability provisions use the term "exculpatory" when referring to limitation of liability clauses.  As noted above, this is a distinction with a very real difference, and has resulted in confusion and inconsistent results in the state appellate and federal district courts.

it and "caused solely by the negligence of [the security guard company] or its employees," applied to the gross negligence of the indemnitor security guard company.  In answering that question in the negative, the district court in *Royal Indemnity* noted the holding in *Neuchatel,* and distinguished that case on the basis that the limitation of liability clause in *Neuchatel* was substantially broader than the one before it.  *Royal Indem. Co.,* 255 F. Supp. 2d at 502.  Moreover, like exculpatory clauses, indemnification clauses are also strictly construed.  *Valhal Corp.,* 44 F.3d at 202; *see also Ratti v. Wheeling Pittsburgh Steel Corp.,* 758 A.2d 695, 705 (Pa. Super. Ct. 2000) (language in an indemnification provision excepting from coverage "such penalties, liabilities, claims, or demands result[ing] from the sole negligence of [indemnitee]" was strictly construed against indemnitee (drafter) and found not to have specifically manifested that exception to indemnification applied to acts of gross negligence).

The cases cited by Great Northern for the proposition that limitation of liability provisions do not apply to gross negligence are all distinguishable and therefore, not dispositive here.  For example, in both *Douglas W. Randall* and *Stark Co.,* although the language in the limitation of liability provisions was identical to that in the ADT Service Ticket, the courts treated the clauses as exculpatory ones, strictly construing the language. In light of the fact that the clauses at issue were limitations of liability, not exculpatory, the district courts in those cases applied too strict a standard in determining whether the language in the limitation of liability clauses also applied to gross negligence.  Moreover, the court in *Douglas W. Randall* did not have the benefit of the Superior Court's decision in *Valeo,* which issued four years later, and the court in *Stark Co.* failed to even mention the *Valeo* decision, but instead relied on *Fidelity Leasing Corp.*, the other case relied on by Great Northern.  In *Fidelity Leasing,* which also predated the Superior Court's decision in *Valeo,* the

44

provision at issue was truly an exculpatory clause, and therefore the strict construction of the language "negligent acts of omission or commission" was appropriate.  Moreover, the language "negligent acts of omission or commission" in *Fidelity Leasing* is much more limiting than the language, "negligence, active or otherwise," contained in ADT's Service Ticket, or in *Neuchatel* and *Home Indem. Corp.*

The Court also finds distinguishable the district court's decision in *Newark Ins. Co. v. ADT Sec. Sys., Inc.,* No. 96-3469, 1997 WL 539752 (E.D.Pa. Aug. 5, 1997).  In that case, the language in the limitation of liability provision with regard to negligence was identical to the language on ADT's Service Ticket–"negligence, active or otherwise."  *Id.* at * 4.  However, once again, the district court referred to the limitation of liability provision as an exculpatory clause, and strictly construed it against the party seeking to limit its liability.  *Id.* at 6.  The court in *Newark Ins.,* relying on *Stark Co., Douglas W. Randall, Inc.,* and *Fidelity Leasing, supra,* predicted that the Pennsylvania Supreme Court would hold that a limitation of liability clause such as the one here and in *Newark Ins.* does not limit the seller's liability caused by its "gross" negligence.  *Id.*  This Court disagrees.  As noted above, both *Douglas W. Randall* and *Fidelity Leasing* were decided before the Superior Court's decision in *Valeo,* and the district court in *Stark Co.* failed to even consider *Valeo* in reaching its conclusion.  In light of the less stringent standard applied to limitation of liability clauses, this Court predicts, therefore, that the Pennsylvania Supreme Court would hold that limitation of liability provisions, such as the one in this case, which contain language limiting liability to losses caused from "negligence, active or otherwise," are sufficiently broad to apply to acts of gross negligence.

Accordingly, the Court finds that ADT is entitled to judgment as a matter of law in its favor

on the issue of whether the "Limitation of Liability" provision also applies to losses resulting from gross negligence.[30]

One final matter merits brief attention. In the event the jury finds that CFU's employees had actual and/or apparent authority to sign the Service Ticket, then based on the above conclusions, the "Limitation of Liability" provision applies and Great Northern's recovery is limited to $ 1,000.00. The Court does not view the application of the "Limitation of Liability" provision as requiring dismissal for lack of subject matter jurisdiction in this diversity case, as ADT suggests. Rather, the amount in controversy requirement for diversity jurisdiction is determined from the face of the complaint and is generally established by a good faith allegation. *Golden ex. rel. v. Golden,* 382 F.3d 348, 354-55 (3d Cir. 2004) (citing *Horton v. Liberty Mut. Ins. Co.,* 367 U.S. 348, 353 (1961); *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288-89 (1938); *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 877 (3d Cir. 1995)). In *Horton,* the Supreme Court explained that "good faith" is shown where it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional

---

[30]ADT argues in the alternative that because there are no degrees of negligence in Pennsylvania, gross negligence is not cognizable under Pennsylvania law and therefore, cannot provide a basis for not applying the "Limitation of Liability" provision. Those courts which have considered a similar argument have rejected it noting that the more recent decisions of the Pennsylvania appellate courts have at least recognized gross negligence as a theory or standard of care, if not as a separate cause of action. *See e.g., In re Scheidmantel,* 868 A.2d 464, 485 (Pa. Super. Ct. 2005) (noting that while Pennsylvania law does not recognize different degrees of negligence, it does apply different "standards of care" (citing *Ferrick* Excavating, *supra*)); Royal *Indem. Co.,* 255 F. Supp. 2d at 506 (distinguishing the holding that "degrees of negligence are not generally recognized under Pennsylvania common law" in *Fialkowski* and *Ferrick Excavating,* respectively, as dicta and as involving the standard of care applicable to bailments and not specifically gross negligence, and noting numerous post-*Ferrick* decisions recognizing gross negligence as a theory or standard under Pennsylvania law (citing *Home Indem. Co.,* 1995 WL 298233, at * 4; other citations omitted)). Thus, since gross negligence as a theory or standard of care appears to be viable under Pennsylvania common law, the Court finds no merit to ADT's alternative argument.

amount to justify dismissal."  367 U.S. at 353 (citing *Red Cab,* 303 U.S. at 289; other citations

omitted).  Therefore, the test "is not what amount the plaintiff claims in the *ad damnum* clause of

his complaint, but rather, whether it appears to a "legal certainty" that he cannot recover an amount

above the jurisdictional minimum."  *Nelson v. Keefer,* 451 F.2d 289, 293 (3d Cir. 1971) (citations

omitted).  "The  inability of plaintiff to recover an amount adequate to give the court jurisdiction

does not show his bad faith or oust the jurisdiction."  *Red Cab,* 303 U.S. at 289 (footnote omitted)

Here, it is not apparent from the face of the pleadings or from the summary judgment record,

to a legal certainty, that Great Northern cannot recover the amount claimed.  Therefore, Great

Northern's potential recovery from ADT, if the jury finds in favor of Great Northern, does exceed

the jurisdictional amount of $ 75,000.  Indeed, it would make little sense for the Court to decide the

merits of the parties' arguments, and to then hold it lacked jurisdiction over the same.  *Nelson,* 451

F.2d at 292 ("'where the jurisdictional issue cannot be stated without the ruling constituting at the

same time a ruling on the merits, [the necessary choice] is to permit the cause to proceed to trial.'"

(quoting *Wade v. Rogala,* 270 F.2d 280, 285 (3d Cir. 1959))).  Thus, the proper relief is to grant or

deny summary judgment, not to dismiss for lack of subject matter jurisdiction.

**IV.**     **CONCLUSION**

For the reasons set forth above, the Court will deny Defendant's Motion for Summary Judgment (Doc. 13) on the issue of whether the "Limitation of Liability" provision is part of the parties' bargain, and will grant Defendant's Motion for Summary Judgment (Doc. 13) in all other respects.  An Order consistent with this opinion will follow.


Dated:  September 17, 2007                          BY THE COURT:


                                                    s/ Terrence F. McVerry
                                                    United States District Judge


cc:     Honorable Lisa Pupo Lenihan
        United States Magistrate Judge

        All Counsel of Record
        *Via Electronic Mail*

48