IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREAT NORTHERN INSURANCE CO., as Subrogee of Croatian Fraternal Union of America, | ) ) ) | |
| | ) | Civil Action No. 06-90 |
| Plaintiff, | ) | |
| | ) | Judge Terrence F. McVerry |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| ADT SECURITY SERVICES, INC., | ) | Doc. No. 46 |
| | | |
| Defendant. | | |

**MEMORANDUM OPINION**

McVERRY, J.

In this subrogation action, Plaintiff, Great Northern Insurance Company ("Great Northern"),

seeks to recover monies it paid its insured, the Croatian Fraternal Union of America ("CFU"), under

a property insurance policy for damages sustained to CFU's building containing its office and

museum, when a broken pipe in its sprinkler system went undetected for a period of time. Great

Northern has brought claims of negligence and breach of implied warranty against Defendant, ADT

Security Services, Inc. ("ADT"), with regard to its conduct in servicing and/or arranging for the

repair of a component part of the panel box that monitors CFU's fire protection and alarm system.

Currently before the Court is ADT's second motion for summary judgment (Doc. No. 46)

submitted post-discovery. Prior to the commencement of discovery, Defendant ADT previously

filed a summary judgment motion (Doc. No. 13) on three issues: (1) whether CFU and ADT

intended, either by their words or conduct, to include in their agreement for service and repair of

CFU's alarm system, the terms and conditions, including a limitation of liability provision, contained

on the reverse side of a service ticket, issued by ADT for proposed repair to a component part of CFU's alarm system and signed by an employee of CFU; and, if so, (2) whether a limitation of liability provision, limiting damages to $ 1,000.00 contained on the reverse side of the service ticket, is valid and enforceable; and (3) whether the language in the limitation of liability provision is broad enough to apply to losses resulting from gross negligence. On September 17, 2007, the District Court issued its Opinion (Doc. 32) and Order (Doc. 33) finding that issues of fact existed as to the first issue, but granting summary judgment in ADT's favor on the second and third issues.

Discovery is now closed, and ADT has filed its second motion for summary judgment asking the Court to find that: (1) there is no genuine issue of material fact that CFU's employee, Robert Keber, had express and/or apparent authority to sign the November 18, 2004 Service Ticket and/or agree to the terms and conditions contained in the service ticket, and ADT reasonably believed that CFU's employee had apparent authority to agree to the terms and conditions in the November 18, 2004 Service Ticket, and therefore, as a matter of law, any recovery by Great Northern is limited to $1,000.00; and (2) CFU is liable for spoliation of evidence and that summary judgment is an appropriate sanction. For the reasons that follow, the Court will grant ADT's summary judgment motion as to the first issue, but will deny the motion as to the second issue.

I.     **RELEVANT FACTS**

The factual background and procedural history were previously set forth in the Court's Opinion dated September 17, 2007 (Doc. No. 32) and will not be repeated here. The following facts, stated in the light most favorable to Great Northern, are relevant to the pending motion and are not disputed.

Plaintiff, Great Northern Insurance Company ("Great Northern"), provided property

insurance coverage to Croatian Fraternal Union of America ("CFU") on its premises and business located at 100 Delaney Drive in Pittsburgh, Pennsylvania ("CFU's facility"), pursuant to Policy No. 35832562. In January of 1989, CFU contracted with Rollins Protective Service ("Rollins") for the purchase and installation of a security detection system to monitor the fire detection and security at CFU's premises.[1] John P. Plesh, who was then the Secretary/Treasurer and a member of the Executive Board of CFU, signed the Security Agreement on behalf of CFU. In April of 1992, Rollins and CFU executed a Commercial Security Purchase and Service Agreement, extending the monitoring service for five years. Plesh also signed the Commercial Security Purchase and Service Agreement on behalf of CFU in his capacity as Secretary/Treasurer.

Beginning on or around August 10, 2001, ADT notified CFU through a letter that announced, in part, that ADT had acquired SecurityLink, CFU's prior monitoring service provider, and that: "Your new ADT protection is in place. . . . The changeover does not require any action on your part. The only change you will notice is that your monitoring invoices will now come from ADT." (Ex. A, Def.'s App. (Doc. 48-2).)[2] CFU and ADT did not enter into a written agreement for system monitoring or maintenance; instead, ADT provided monitoring services for charge, on a month- to-month basis, and maintenance service as requested by CFU and for an appropriate fee and/or charge. Specifically, ADT provided monitoring services to CFU for its facility at Delaney Drive and when contacted by CFU, ADT appeared to maintain or service the monitoring system, a Radionics Panel D8112G2 ("Radionics Panel"), and the burglar alarm located at CFU's facility. From 2001 until

---

[1] The security detection system included a monitoring system, a burglar alarm system, and a fire detection system, including a deluge sprinkler system, at CFU's facility.

[2] Edward Pazo, current Secretary/Treasurer of CFU, testified that he read the August 10, 2001 letter. (Pazo Dep. at 134.)

January 2005, ADT submitted monthly invoices for its alarm monitoring services, and sent those invoices directly to CFU's executive offices for payments. (Ex. C in Def.'s App.) When CFU representatives contacted ADT and requested maintenance, service or repair to the Radionics Panel and/or the burglar alarm, ADT charged CFU for labor and materials. At all relevant times, ADT did not design, install, maintain, repair or service the CFU fire protection system, including the deluge sprinkler system located at CFU's facility, nor did ADT design or install the CFU monitoring or burglar alarm system.

On those occasions when ADT service technicians appeared at the request of CFU and performed maintenance, service or repair to the Radionics Panel and/or the burglar alarm at CFU's facility, the ADT service technician prepared a document identified as a "Service Ticket" (ADT Security Form 524-07), "ADT Service Documentation" (ADT Security Form 524-08), and/or an "ADT Service Authorization" (ADT Security Form 524-09) (collectively "Service Tickets"). For example, ADT service technicians appeared at CFU's facility on the following six dates to perform maintenance, repair or service to the Radionics Panel or the burglar alarm pursuant to a request received from CFU: January 30, 2003, June 14, 2004, November 18, 2004 (Service Tickets); June 22, 2005 (ADT Service Documentation); and February 8, 2006 and March 2, 2006 (ADT Service Authorizations). On each of these six occasions, either Robert D. Keber, the CFU facilities manager,[3] or Mark Hile, also employed by CFU, signed the Service Tickets, Service Documentation,

---

[3]Mr. Pazo testified that the title "facilities manager" was not a formal title, and did not "impart to [Mr. Keber] any specific authorities that the term manager may entail." (Pl.'s Statement of Additional Material Facts ("Pl.'s SAMF") (Doc. No. 58), ¶ 51 (citing Pazo Dep. at 44).) Mr. Pazo described Mr. Keber's responsibilities and duties as maintaining the facility, removing snow from the parking lot, making sure that the HVAC and security systems operated correctly, opening the building in the morning at 6:00 a.m., and assuring that any contractors hired by CFU fulfilled their work-related orders. (Pl.'s SAMF, ¶ 57 (citing Pazo Dep. at 16-17, 27).) Mr. Keber's duties were not formalized in a written

and Service Authorizations.[4]  Mr. Keber was the primary contact person at CFU who interacted with the ADT service technicians on maintenance and repair of CFU's security systems.  (Keber Dep. at 121-22, 138-41; Pazo Dep. at 88.)[5]

Each ADT Service Ticket, Service Documentation, and Service Authorization, respectively, includes, among other things, preprinted information such as "Limitation of Liability" and "Limited Warranty" provisions, as well as a "General" notice that notifies the customer that ADT Security does not assume any liability for delays associated with the installation of equipment, and an "Equipment Disconnections" notice that notifies the customer that its system is temporarily or permanently disconnected and cannot transmit notice to ADT Security.  (Ex. B in Def.'s App.)

---

document, but rather, consisted of "whatever he's directed to do or agreed upon between he and the board members of the [CFU]."  (*Id.* at ¶ 58 (citing Pazo Dep. at 16-17).)

[4]In its Response to Defendant's Concise Statement of Material Facts ("Pl.'s Resp.") (Doc. 58, ¶11), Plaintiff states that Keber and Hile are maintenance employees who had limited authorization from the Executive Board of CFU regarding service documentation.  Support for Plaintiff's response is found later in its own SAMF at ¶ 54, where Plaintiff cites to the deposition testimony of Pazo at 185-86 to show that Keber and Hile were authorized to sign service tickets to confirm that the work was actually performed as reflected in the service ticket, but neither of them had authority to approve payments for work performed.  The parties agree that Pazo retained full authority to make such decisions as contacting another service provider or approving a service expense.  (Doc. 58, ¶ 53; Doc. 63, ¶ 53.)

[5]Mr. Pazo specifically testified: "[Mr. Keber] would be the one who would interact with a person, the service man who comes in.  He would call for service if need be, meet the person, explain the problem, direct him to where the physical property was.  He would then be the one who would, if requested to sign a document that you're referring to, he would sign that as a verification that the service was performed."  (Pazo Dep. at 88.)  Mr. Keber did not have the authority to contact another service provider for the security system.  Even in the matter of identifying or changing a contact on the emergency contact list, Pazo retained the authority to contact ADT.  (Pazo Dep. at 116-17.)  While CFU extended a certain amount of discretion to Keber for the operation of the facility, it did not authorize him to develop and implement protocol for matters involving safety issues, including, for example, fire evacuation.  The development of a fire evacuation plan would be handled by the office of the National Secretary/Treasurer in conjunction with the President and Vice-President.  (*Id.* at 141.)  Mr. Keber was not authorized to make the decision to replace the alarm panel based on ADT's recommendation; such a decision was the responsibility of the CFU executive board.  (*Id.* at 164-65.)

On November 18, 2004, in response to a notice of a "service com failure"[6] at CFU's facility, ADT directed one of its commercial service technicians, Kevin Ferri, to appear at CFU's facility.[7] On November 18, 2004, Mr. Ferri appeared at CFU's facility and confirmed that the Radionics Panel could not communicate with the ADT Security monitoring center because of a problem with a component part called a "dialer." (Ferri Aff. ¶¶ 7-12; Ferri Dep. at 43-46; Keber Dep. at 153-60.) Mr. Ferri informed Mr. Keber that CFU had the option of removing the Radionics Panel, sending it to Bosch in California for service and/or repair, or installing a new monitoring system. (Ferri Aff., ¶ 12; Ferri Dep. at 47-50; Keber Dep. at 153-60.)

Given the inoperable condition of the Radionics Panel on November 18, 2004 due to the broken dialer, the Radionics Panel was unable to send signals from the burglar alarm system and fire protections system, including the deluge sprinkler system, to ADT's monitoring system. Thus, the effect was essentially the same after the removal of the Radionics Panel as it was before, in that in either event, CFU's burglar alarm and fire protections systems were unable to communicate with ADT's monitoring system. (Ferri Dep. at 66-67; Keber Dep. at 153-160.)[8]

On November 18, 2004, during ADT's actual service call, and prior to removal of the Radionics Panel by Ferri and Mr. Keber's signing of the Service Ticket, Mr. Keber contacted Ed

---

[6]A "service com failure" refers to a "notice that indicates the Radionics Panel located at [CFU's premises] could not, or cannot communicate with the ADT Security monitoring center." *See* Affidavit of Kim Talento ("Talento Aff."), ¶ 9 (Ex. E in Def.'s App. (Doc. 48-8); Affidavit of Kevin Ferri ("Ferri Aff."), ¶ 9 (Ex. D in Def.'s App. (Doc. 48-7)).

[7]ADT's commercial service technician, Kevin Ferri, had no dealings with anyone from CFU other than Keber and Hile. (Ferri Dep. at 97.)

[8]Plaintiff denies this statement to the extent it is inconsistent with its position that the failure of ADT to re-install the Radionics Panel by January 23, 2005 directly caused the activation of the deluge sprinkler system to go undetected for a substantial period of time. Plaintiff fails, however, to cite to where in the record its counterstatement finds support.

Pazo, CFU Secretary/Treasurer, to advise him of the status of the repair, to discuss the available repair options, and to notify him of the fact that service would not be provided during the time that the Radionics Panel would be removed. (Keber Dep. at 155-57; Pazo Dep. (Ex. I in Def.'s App.) at 202-204.) After being advised of the above, Mr. Pazo gave express authority to Mr. Keber to direct ADT to perform the removal of the Radionics Panel and to have the panel repaired. (Keber Dep. at 248-49; Pazo Dep. at 198-204.)[9]

On November 18, 2004, Mr. Keber was the only person from CFU who spoke with Ferri, the ADT service technician. (Pazo Dep. at 204, 206-07.) In addition, the only time Ferri and Keber discussed the extent of Keber's authority was on November 18, 2004 regarding the removal of the Radionics panel and with regard to his authority to sign the Service Ticket. (Ferri Dep. at 97.)

Thereafter, Mr. Ferri produced an ADT Service Ticket,[10] upon which he inserted the following handwritten information about the service call on the front side above the signature of Mr. Keber: "*Customer understands that Security/Fire protection at site will be out of service." (Ex. B in Def.'s App.) Mr. Ferri then presented the Service Ticket to Mr. Keber for review and approval. Mr. Keber testified that before he signed the Service Ticket, he specifically discussed with Mr. Ferri the handwritten notation on the Service Ticket and that Mr. Ferri verbally communicated this handwritten notation and showed him where it was located on the Service Ticket. (Keber Dep. at 153.)

---

[9]Plaintiff admits that Mr. Pazo gave Mr. Keber authority to sign the Service Ticket, but submits that it was only for the limited purpose of authorizing the removal and repair of the Radionics panel. (Doc. 58, ¶¶ 54-55.)

[10]Kevin Ferri understood that a service ticket confirmed that ADT appeared for a service call and performed the necessary work. (Ferri Dep. at 100-101.)

Before Mr. Keber signed the Service Ticket on November 18, 2004, Mr. Ferri testified that he told Mr. Keber there was information on the reverse side of the ticket that he should review, and he gave Mr. Keber an opportunity to read the reverse side, but Ferri never told Mr. Keber what information was contained on the reverse side of the Service Ticket, nor did he read any of that information to Keber. (Ferri Dep. at 85-86, 89, 92.) In addition, Mr. Ferri did not ask Mr. Keber whether he read and understood what was on the reverse side of the ticket, and Mr. Keber did not ask any questions about it. (Ferri Dep. at 95.) Ferri never discussed with Keber whether he had authority to agree to the terms and conditions on the reverse side of the Service Ticket, or whether Keber had authority to enter into contracts on behalf of CFU. (Ferri Dep. at 96-100, 103-04.) In fact, November 18, 2004 was the first time Mr. Ferri informed Mr. Keber about the language on the reverse side of the ADT Service Tickets. (Ferri Dep. at 91.) Ferri explained that he did so on November 18, 2004 because of the importance of the effect of removing the Radionics panel. (Ferri Dep. at 90.) Mr. Ferri observed Mr. Keber sign the Service Ticket and just glance at the information on the reverse side. (Ferri Dep. at 88.)

Although Ferri had "glanced over some of the bold print," he was unaware of what information was being conveyed by the "legal language" contained on the reverse side of the Service Ticket, including the limitation of liability provision. (Ferri Dep. at 92-93, 95.) ADT never explained to Mr. Ferri what was contained on the reverse side, never told him to explain the terms on the reverse side of the service ticket to the customer, never trained Mr. Ferri in the significance of the language or told him that the language would bind the customer, and never provided Mr. Ferri with any instructions in conveying information to a customer presented with a service ticket. (Doc. 58, ¶ 63 (citing Ferri Dep. at 93-94); Doc. 63, ¶ 63.)

The reverse side of the November 18, 2004 Service Ticket contains the following "LIMITATION OF LIABILITY" provision:

> IT IS UNDERSTOOD THAT ADT IS NOT AN INSURER, THAT INSURANCE, IF ANY, SHALL BE OBTAINED BY THE CUSTOMER AND THAT THE AMOUNTS PAYABLE TO ADT HEREUNDER ARE BASED ON THE VALUE OF SERVICES AND THE SCOPE OF LIABILITY AS HEREIN SET FORTH AND ARE UNRELATED TO THE VALUE OF THE CUSTOMER'S PROPERTY OR PROPERTY OF OTHERS LOCATED IN CUSTOMER'S PREMISES. CUSTOMER AGREES TO LOOK EXCLUSIVELY TO CUSTOMER'S INSURER TO RECOVER FOR INJURY OR DAMAGE IN THE EVENT OF ANY LOSS OR INJURY AND RELEASES AND WAIVES ALL RIGHT OF RECOVERY AGAINST ADT ARISING BY WAY OF SUBROGATION. ADT MAKES NO GUARANTY OR WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS THAT THE SYSTEM OR SERVICES SUPPLIED, WILL AVERT OR PREVENT OCCURRENCES OR THE CONSEQUENCES THEREFROM, WHICH THE SYSTEM OR SERVICE IS DESIGNED TO DETECT. IT IS IMPRACTICAL AND EXTREMELY DIFFICULT TO FIX THE ACTUAL DAMAGES, IF ANY, WHICH MAY PROXIMATELY RESULT FROM FAILURE ON THE PART OF ADT TO PERFORM ANY OF ITS OBLIGATIONS HEREUNDER. THE CUSTOMER DOES NOT DESIRE THIS CONTRACT TO PROVIDE FOR FULL LIABILITY OF ADT AND AGREES THAT ADT SHALL BE EXEMPT FROM LIABILITY FOR LOSS, DAMAGE OR INJURY DUE DIRECTLY OR INDIRECTLY TO OCCURRENCES, OR CONSEQUENCES THEREFROM, WHICH THE SERVICE OR SYSTEM IS DESIGNED TO DETECT OR AVERT; THAT IF ADT SHOULD BE FOUND LIABLE FOR LOSS, DAMAGE OR INJURY DUE TO A FAILURE OF SERVICE OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED TO A SUM EQUAL TO 10% OF THE AGGREGATE PRICE REFLECTED ON THE FRONT HEREOF OR $ 1,000, WHICHEVER IS GREATER, AS THE AGREED UPON DAMAGES AND NOT AS A PENALTY, AS THE EXCLUSIVE REMEDY; AND THAT THE PROVISIONS OF THIS PARAGRAPH SHALL APPLY IF LOSS, DAMAGE, OR INJURY IRRESPECTIVE OF CAUSE OR ORIGIN, RESULTS DIRECTLY OR INDIRECTLY TO PERSON OR PROPERTY FROM

> PERFORMANCE OR NONPERFORMANCE OF OBLIGATIONS
> IMPOSED BY THIS CONTRACT OR FROM NEGLIGENCE,
> ACTIVE OR OTHERWISE, STRICT LIABILITY, VIOLATION OF
> ANY APPLICABLE CONSUMER PROTECTION LAW OR ANY
> OTHER ALLEGED FAULT ON THE PART OF ADT, ITS
> AGENTS OR EMPLOYEES. . . . IF THE CUSTOMER DESIRES
> ADT TO ASSUME A GREATER LIABILITY, ADT SHALL
> AMEND THIS AGREEMENT BY ATTACHING A RIDER
> SETTING FORTH THE AMOUNT OF ADDITIONAL LIABILITY
> AND THE ADDITIONAL AMOUNT PAYABLE BY THE
> CUSTOMER FOR THE ASSUMPTION BY ADT OF SUCH
> GREATER LIABILITY PROVIDED, HOWEVER, THAT SUCH
> RIDER AND ADDITIONAL OBLIGATION SHALL IN NO WAY
> BE INTERPRETED TO HOLD ADT AS AN INSURER, IN THE
> EVENT ANY PERSON, NOT A PARTY TO THIS AGREEMENT,
> SHALL MAKE ANY CLAIM OR FILE ANY LAWSUIT AGAINST
> ADT IN ANY WAY RELATING TO THE EQUIPMENT OR
> SERVICES THAT ARE THE SUBJECTS OF THIS AGREEMENT,
> INCLUDING FOR FAILURE OF ITS EQUIPMENT OR SERVICE
> IN ANY RESPECT; . . .

*See* Ex. B in Def.'s App. In addition, the Service Ticket contains the following "GENERAL" Term

and Condition:

> ADT ASSUMES NO LIABILITY FOR DELAYS IN
> INSTALLATION OF THE EQUIPMENT, OR FOR
> INTERRUPTIONS OF SERVICE DUE TO STRIKES, RIOTS,
> FLOODS, FIRES, ACTS OF GOD OR ANY CAUSES BEYOND
> THE CONTROL OF ADT AND WILL NOT BE REQUIRED TO
> SUPPLY SERVICE TO THE CUSTOMER WHILE
> INTERRUPTION OF SERVICE DUE TO ANY SUCH CAUSE
> SHALL CONTINUE.

*Id.* With regard to "EQUIPMENT DISCONNECTIONS," the Service Ticket states: "This

represents ADT's notice to you that the system(s)/device(s) listed on the face of this Service Ticket

as temporarily or permanently disconnected are no longer in service and, thus, cannot detect and/or

report occurrences or transmit signals." *Id.*

The ADT Security Service Tickets, Service Documentation, and Service Authorizations

between ADT and CFU dated January 30, 2003, June 14, 2004, June 22, 2005, February 8, 2006, and March 2, 2006, contain the same or similar Limitation of Liability, Equipment Disconnections, and General provisions as the November 18, 2004 Service Ticket. (Ex. B to Def.'s App.)

After Mr. Keber signed the service tickets and/or other service documentation approving repairs or maintenance, he forwarded those documents, including the November 18, 2004 Service Ticket, to Mr. Pazo's secretary, who in turn would present it to Mr. Pazo for review. (Keber Dep. at 98, 160; Pazo Dep. at 212.) Pazo does not recall looking at the November 18, 2004 Service Ticket or any other service ticket; however, if such documents were presented to him, he would have reviewed them, but it would only have been for the purpose of approving payment for services. (Pazo Dep. at 87.) Pazo also reviewed monthly invoices from ADT and approved same for payment. (Pazo Dep. at 87, 97-100.) Mr. Pazo is the point person for the CFU executive board. (Pazo Dep. at 161.)

As of January 23, 2005, the Radionics Panel had not been replaced and the monitoring system located at CFU's facility could not contact the ADT Security monitoring center. On January 23, 2005, a pipe in the sprinkler system broke at CFU's premises, causing the premises' deluge system to activate, which went undetected for a substantial period of time, resulting in damage to CFU's building and its contents. Pursuant to Policy No. 35832562 issued by Great Northern to CFU, Great Northern made payments to CFU for the damage to its building and contents.

Great Northern became subrogated to the rights of CFU as a result of such payment and subsequently instituted the present action on February 2, 2006, asserting that ADT was negligent and breached an implied warranty by failing to properly inspect, maintain, service and repair the alarm system, including the Radionics Panel, and that such failure allowed the deluge system to flow

undetected for a substantial period of time in violation of the applicable building and fire codes.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by *Matsushita* Court).  An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.   LAW OF THE CASE

Preliminarily, ADT argues that because this Court previously decided several issues as a matter of law in its Opinion and Order dated September 17, 2007, those rulings have become the law of the case in this action.  In particular, ADT contends the following rulings are binding by the law of the case doctrine: (1) that if Mr. Keber had authority to bind CFU, the Terms and Conditions on

the Service Ticket, including the Limitation of Liability provision, are a part of the parties' bargain (Doc. No. 32 at 24, 28-29); (2) that the Limitation of Liability provision is enforceable (*Id.* at 36); and, (3) that the Limitation of Liability provision applies to acts of gross negligence (*Id.* at 42). Moreover, the Court also concluded that material issues of fact existed precluding summary judgment on the issue of whether CFU's employees had actual or apparent authority to agree to the terms and conditions contained in the November 18, 2004 Service Ticket, including the Limitation of Liability provision. (Doc. No. 32 at 33.) ADT submits that after substantial discovery which has produced admissions and other undisputed facts establishing that Mr. Keber had authority to sign the Service Ticket and bind CFU to its terms, reconsideration of this issue is permitted by the law of the case doctrine because the Court is being asked to reconsider an issue of fact, and not a question of law. In support, ADT cites *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 816 (1988), and *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 116 (3d Cir. 1997). Great Northern does not appear to dispute ADT's argument as it does not address this argument in its responsive brief.

The law of the case doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). The doctrine promotes finality and judicial economy, as it prevents courts from entertaining endless challenges to settled issues. *Id.* (citations omitted); *see also Public Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 116 (3d Cir. 1997). Moreover, "'[l]aw of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.'"

*Public Interest Research Group,* 123 F.3d at 116 (quoting 18 Charles A. Wright, Arthur R. Miller,

Edward Cooper, FEDERAL PRACTICE & PROCEDURE § 4478 at 788 (1981)). The court of appeals

went on to explain that the law of the case doctrine does not limit the power of a federal court, but

instead, directs the court to exercise its discretion. *Id.* (citing *Arizona v. California,* 460 U.S. at 619;

*Messinger v. Anderson,* 225 U.S. 436, 444 (1912)). The scope and nature of this discretion has been

expounded upon by the Supreme Court:

> "A court has the power to revisit prior decision of its own or of a
> coordinate court in any circumstance, although as a rule courts should
> be loathe to do so in the absence of extraordinary circumstances such
> as where the initial decision was 'clearly erroneous and would work
> a manifest injustice.'"

*Id.* (quoting *Christianson,* 486 U.S. at 817)). The court of appeals has identified three extraordinary

circumstances that would justify reconsideration of an issue previously decided during the course

of litigation: "(1) new evidence is available; (2) a supervening new law has been announced; or (3)

the earlier decision was clearly erroneous and would create manifest injustice." *Id.* at 116-17

(citations omitted).

In the present case, the Court sees no reason to revisit the three legal rulings identified above

by ADT that were previously decided in its September 17, 2007 Opinion and Order. With regard

to the issue of Keber's authority to bind CFU to the terms and conditions on the Service Ticket, the

Court finds that it is not precluded from revisiting this issue as it involves a question of fact and

discovery has yielded new evidence not previously available to inform the Court's decision.

Accordingly, the Court will proceed to analyze the substantive arguments of the parties on this issue.

## IV.    DISCUSSION

A federal court exercising diversity jurisdiction is required to apply the substantive law of

the forum state. *Covington v. Cont'l Gen. Tire, Inc.,* 381 F.3d 216, 218 (3d Cir. 2004); *Highlands Ins. Co. v. Hobbs Group, LLC,* 373 F.3d 347, 351 (3d Cir. 2004) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938)(other citation omitted)).   Thus, Pennsylvania law governs the legal issues presented here.

### A.      Whether Keber Had Authority to Bind CFU

In the September 17, 2007 Opinion, this Court declined to grant summary judgment on the issue of whether the Limitation of Liability provision was binding against CFU because the Court found that material issues of fact remained as to the actual or apparent authority of CFU's employees, and as to whether ADT reasonably believed CFU's employees had apparent authority to agree to the terms and conditions in the November 18, 2004 Service Ticket. (Doc. No. 32 at 33.) Subsequently, the parties had an opportunity to conduct discovery in this case, and ADT now contends that the undisputed evidence in the record establishes that Keber had actual and/or apparent authority to authorize and sign the Service Ticket and therefore bind CFU to the terms and conditions contained on the Service Ticket.   On the other hand, Great Northern responds that the authority granted to Keber by Pazo was strictly limited to authorizing ADT to remove the panel for repair, and did not include agreeing to the terms and conditions on the reverse side of the Service Ticket.   Great Northern further submits that questions of fact remain with regard to whether Keber had apparent authority, thus precluding summary judgment.

Under Pennsylvania law, the liability of a principal to third parties for the acts of its agent can be established based on either: "(1) express authority, or that which is directly granted; (2) implied authority, to do all that is proper, usual and necessary to the exercise of the authority actually granted; (3) apparent authority, as where the principal holds one out as agent by words or conduct,

and (4) agency by estoppel." *Apex Fin. Corp. v. Decker,* 369 A.2d 483, 485 (Pa. Super. Ct. 1976) (citation omitted); *see also Bolus v. United Penn Bank,* 525 A.2d 1215, 1221 (Pa. Super. Ct.1987) (citation omitted); *Penn City Investments, Inc. v. Soltech, Inc.,* No. 01-5542, 2003 WL 22844210, * 14 (E.D.Pa. Nov. 25, 2003) (citation omitted). The party asserting an agency relationship bears the burden of proof on that issue. *Apex Fin. Corp.,* 369 A.2d at 485 (citing *Girard Trust Bank v. Sweeney,* 231 A.2d 407 (Pa. 1967)).

Express and implied authority are included in the more general term, actual authority. *Jones v. Van Norman,* 522 A.2d 503, 511 (Pa. 1987). Express authority, which is found where the principal directly states that an agent has authority to perform a specific act on its behalf, is to be strictly construed. *Jones*, 522 A.2d at 511 (citations omitted). Based on the grant of express authority, an agent also acquires implied authority "to do all that is proper, necessary and ordinary to exercise the authority that has expressly been granted to him." *Id.* (citation omitted). Although implied, such authority is considered actual authority based on the presumption that the principal reasonably would want the act done in order to achieve the express purpose of the agency. *Id.* Implied authority, therefore, does not exist if there is no express authority in the first instance. *Ortiz v. Duff-Norton Co.,* 975 F.Supp. 713, 718 n.2 (E.D.Pa. 1997).

Unlike implied authority, apparent authority can exist without express authority. "Apparent authority exists where a principal, *by words or conduct,* leads people with whom the alleged agent deals to believe that the principal has granted the agent authority he or she purports to exercise." *Turner Hydraulics, Inc. v. Susquehanna Constr. Corp.,* 606 A.2d 532, 534 (Pa. Super. Ct. 1992) (citation omitted; emphasis in original). In determining the apparent authority of an agent, the court must focus on the actions of the principal, not the agent. *Bolus,* 525 A.2d at 1222 (citations omitted);

*Penn City Investments,* 2003 WL 228442210, at * 14 (citation omitted). Usually, apparent authority

is shown by "some communication from the principal to the third party, such that it would be

reasonable for the third party to infer that the principal consents to have the agent act for him. This

can be shown, though, by the grant of limited authority to the agent, and conduct of the agent which

demonstrates to the third party the agent's apparent authority to bind the principal. *Ortiz,* 975

F.Supp. at 718 n. 2 (citing *Leidigh v. Reading Plaza Gen., Inc.,* 636 A.2d 666, 667-68 (Pa. Super.

Ct. 1994); *Turner Hydraulics,* 606 A.2d at 534)). If the third party has actual knowledge of the

limits of the agent's authority, the third party cannot rely on the agent's apparent authority to bind

the principal. *Bolus,* 525 A.2d at 1222; *see also Universal Computer Sys., Inc. v. Med. Serv. Ass'n*

*of Pa.,* 628 F.2d 820, 823 (3d Cir. 1980) (citing *Schenker v. Indem. Ins. Co.,* 16 A.2d 304, 306 (Pa.

1940)). Without that actual knowledge, however, the third party is required to exercise only

reasonable diligence to ascertain the agent's authority. *Bolus,* 525 A.2d at 1222 (citation omitted).

As explained by the Pennsylvania Superior Court:

> The third party is entitled to believe the agent has the authority he
> purports to exercise only where a person of ordinary prudence,
> diligence and discretion would so believe. Thus, a third party can rely
> on the apparent authority of an agent when this is a reasonable
> interpretation of the manifestations of the principal.

*Id.* (internal citations omitted).

Ordinarily, the nature and extent of an agent's authority presents a question of fact for the

jury. *Bolus,* 525 A.2d at 1221 (citations omitted); *Turner Hydraulics,* 606 A.2d at 534-35 (citing

*Bolus, supra*; other citations omitted); *see also AMCO Ukrservice v. Am. Meter Co.,* 312 F. Supp.

2d 681, 696 (E.D.Pa. 2004) (whether apparent authority exists in a given case is almost never

resolved on summary judgment because this issue turns closely on both the principal's

manifestations and the reasonableness of the third party's beliefs (citing *Gizzi v. Texaco, Inc.,* 437 F.2d 308, 310 (3d Cir. 1971))). Where, however, the facts relating to the nature and existence of the agency relationship are not contested, the court may properly decide the issue. *Penn City Inv.,* 2003 WL 22844210, at * 14 (citation omitted). In ascertaining whether apparent authority exists, the factfinder must evaluate the conduct of the parties in light of all the circumstances. *Turner Hydraulics,* 606 A.2d at 535 (citations omitted). Moreover, apparent authority may be gleaned from a course of dealing or a single transaction. *Id.* (citations omitted).

### 1. Actual Authority

In opposing ADT's summary judgment motion, Great Northern argues that the authority granted to Keber during his discussion with Pazo on November 18, 2004 was strictly limited to ADT's removal of the panel for repair. Great Northern further submits that there is no testimony from any party that Keber showed Pazo the Service Ticket or discussed it with him prior to removal of the panel. In addition, Great Northern posits that Keber's testimony (Keber Dep. at 158-59) establishes only that he reappeared and authorized the removal of the Radionics panel after his discussion with Pazo and there were no discussions or written communications between Ferri and Keber regarding limitations to signing ADT documents. Great Northern also relies on Ferri's testimony, which Great Northern summarizes as stating that Ferri never asked Keber whether he had authority from CFU to enter into a contract with ADT, did not know whether Keber was an officer of CFU, did not ask Keber to read the back of the Service Ticket presented on November 18, 2004,[11]

---

[11]An examination of Ferri's actual testimony reveals that Ferri handed the November 18, 2004 Service Ticket to Keber for review and told him "there's information on the front of this ticket, on the back of the ticket. Please read everything." Ferri Dep. at 86. In response to the question of whether Ferri ever saw Keber turn the document over and read the reverse side of the document, Ferri responded: "All I remember was [Keber] signed the document and he just glanced at the back of the document

and was unaware that the back of the Service Ticket contained a Limitation of Liability provision. Thus, Great Northern argues, this evidence does not in any way establish that Pazo expressly authorized Keber to agree to the Limitation of Liability provision on the reverse side of the Service Ticket. Because a lack of communication does not establish actual authority, Great Northern submits that ADT has failed to meet its burden of proving actual authority.

Viewing the evidence in the light most favorable to Great Northern, the Court finds the evidence shows unequivocally that Keber had actual authority to sign the November 18, 2004 Service Ticket for the purpose of authorizing the removal and repair of the Radionics panel. Keber was employed by CFU as its facility manager, and as such, was vested with the responsibility of maintaining CFU's facility, which included, among other things, making sure the HVAC and security systems operated correctly and assuring that any contractors hired by CFU fulfilled their work-related orders. In addition, Keber was the primary contact person at CFU who interacted with the ADT service technicians on maintenance and repair of CFU's systems. It is also clear that Keber had actual authority to place calls to ADT for service and to sign service tickets and other service documentation showing the work performed by ADT and authorizing said work. Indeed, Great Northern stated in its Statement of Additional Material Facts that Keber and Hile were authorized to sign service orders to confirm that a contractor actually performed the work reflected in the Service Ticket, and Keber regularly signed service tickets and delivered them to Pazo's office for payment approval. (Doc. No. 58 at ¶¶ 54-55.)[12]

--------

because I told him there was information on the back that he might want to read." *Id.* at 88.

[12]Plaintiff attempts to create an factual issue as to whether Mr. Pazo authorized Keber to sign the Service Ticket by responding to paragraph 21 of ADT's Concise Statement of Material Facts ("Def.'s

With regard to the November 18, 2004 Service Ticket, the only person at CFU with whom Ferri interacted was Keber. The parties agree that after Ferri explained the repair options to Keber and prior to removal of the Radionics panel on November 18, 2004, Keber went to CFU point person, Ed Pazo, and sought approval to have the Radionics panel removed and the repair work done. Pazo authorized ADT to remove the Radionics panel and conveyed that authorization to Keber. (Doc. Nos. 58 & 63, ¶ 49 .) Moreover, while it does appear from the record that Mr. Keber did not specifically ask Mr. Pazo if he could sign the Service Ticket for the November 18, 2004 service call, such authority can be implied from Pazo's authorization of the repair work, as well as from the established CFU practice and procedure for requesting and authorizing service/repair of its security monitoring system. The following excerpt from Keber's deposition reveals that Keber testified unequivocally that he had authority to sign the November 18, 2004 Service Ticket and that Ed Pazo gave him that authority:

> Q.:   So on November 18, 2004 you have the authority to retain Mr. Ferri or ADT to perform the removal of the Radionics panel and to have the Radionics panel repaired by the manufacturer or some other provider?
> A.:   Correct.
> Q.:   And you signed the ticket authorizing that to occur?
> A.:   Yes.
> Q.:   And you had the authority to sign the ticket?
> A.:   Right.
> Q.:   And you understood at the time you signed it that Ed Pazo gave you that authority?
> A.:   Correct.
> Q.:   And Mr. Pazo didn't ask you to come back to him and seek any other authority before you signed that ticket–

---

CSMF" (Doc. No. 49), ¶ 21) that there is no evidence that Mr. Keber asked Mr. Pazo if he could sign the Service Ticket or that he even discussed the subject (Doc. 58, ¶ 21). However, Great Northern's own statements in paragraphs 54 and 55 of its response (Doc. 58) belie this unsupported denial.

A.:     No.

Q.:     –November 18th, correct, he did not ask you to come back?

A.:     No, there wasn't a second approach, no.

Keber Dep. at 248, l. 5-25.

Nothing in Mr. Pazo's testimony suggests a contrary finding. Mr. Pazo's testimony indicates that from 1994 to July 2008, Mr. Keber was the one who placed the calls for service when needed, met and interacted with the service technicians, and signed the Service Tickets, and that Mr. Pazo was aware that Mr. Keber signed the Service Tickets to verify that the repair work had been performed, and Pazo approved of that procedure. (Pazo Dep. at 88.) In addition, Mr. Pazo testified that it was fair to say that since Pazo authorized the removal of the Radionics Panel, that "[Mr. Keber] also had the authority or [Pazo] also authorized the cost that CFU would incur in order to have the panel repaired." (Pazo Dep. at 210.) Mr. Pazo also stated several times during his deposition that although he did not recall the specifics of his conversation with Mr. Keber on November 18, 2004, he believed that Mr. Keber was truthful. For example, Keber testified that he discussed the contents of the Service Ticket for the November 18, 2004 repair with Mr. Pazo and Mr. Pazo replied that he "ha[d] no reason to doubt that." (Keber Dep. at 155-56; Pazo Dep. at 198.)

Thus, the incontrovertible evidence shows that Mr. Keber had actual authority to sign the November 18, 2004 Service Ticket. In addition, signing the Service Ticket was necessary for the Radionics panel to be removed and the repair work performed. Because Pazo authorized the work, he therefore granted Keber the authority to do what was necessary to have the repair work performed, which meant signing the Service Ticket. Accordingly, the Court concludes that Keber had implied authority to sign the November 18, 2004 Service Ticket.

The Court is not convinced otherwise by the ADT service technician's failure to ask Keber

if he had authority to bind CFU to contractual arrangements, or the fact that Keber did not have general authority to bind CFU to contractual arrangements. First, Ferri testified that he did ask Keber if he had authority to sign the Service Ticket on November 18, 2004. Second, and more importantly, this case does not involve a situation where Keber attempted to enter into a contract with ADT on his own based on some general authority to act on behalf of CFU. Rather, Keber, recognizing the impact of removing the Radionics panel from the security system, specifically went to the CFU point person, Ed Pazo, and requested authorization for this particular repair. Pazo approved the repair and authorized Keber to have the panel removed and repaired, and in doing so, granted actual authority to Keber to bind CFU with regard to performing the repair. Moreover, assuming that Great Northern is correct that only the executive board of CFU could enter into contracts on behalf of CFU or bind CFU contractually, that does not equate to the corollary that an employee could never bind CFU contractually. If that were the case, employers would never be found liable for the *authorized* acts of their employee-agents, contrary to established Pennsylvania law on agency. Previously, this Court determined that Keber's actions, specifically placing the call to ADT for service, requesting and authorizing service, and signing the service ticket, all of which were authorized by CFU, gave rise to the creation of an implied contract between CFU and ADT, and that the Limitation of Liability provision was part of the parties' agreement. This implied contract is no less enforceable simply because it arose from the *authorized actions* of CFU's employee, as opposed to the direct action of CFU's executive board.

The question still remains, however, whether Keber's actual authority to sign the Service Ticket included the authority to bind CFU to the terms and conditions contained on the reverse side of the Service Ticket. This question is answered by the Court's rulings in its September 17, 2007

Opinion. In that opinion, this Court held that the service arrangement between CFU and ADT gave rise to an implied contract,[13] which arose from the conduct of the parties, and together, this conduct and the Service Tickets constituted the entire agreement of the parties. (Doc. No. 32 at 18.) This Court further held that all of the terms of the November 18, 2004 Service Ticket, including the Limitation of Liability provision, were part of the bargained for agreement between CFU and ADT. (*Id.* at 28-29.) Therefore, because Keber was granted actual authority to sign the Service Ticket, and the terms of the Service Ticket have been determined to be part of the parties' agreement regarding service of the monitoring system, the Court finds that CFU is bound by the terms on the Service Ticket.

## 2. Apparent Authority

ADT next argues that Keber had apparent authority to bind CFU to the terms and conditions on the Service Ticket. Essentially, ADT contends that based on Ferri's past dealings with Keber, Keber's actual authority to have the Radionics panel repaired and sign the Service Ticket, and Keber's position as facilities manager, Ferri and ADT reasonably believed Keber had the authority to contract for the repairs and agree to the terms conspicuously set forth on the Service Ticket.

In opposing ADT's argument, Great Northern correctly submits that in determining the apparent authority of an agent, a court must look to the actions of the principal. In this regard, Great Northern contends that the evidence shows that CFU did not present Keber as being clothed with authority to commit CFU to agree to a contractual agreement or event to approve a financial expenditure related to the security system, and further, the testimony establishes that CFU did not

---

[13]Specifically, this Court found that when CFU requested service on its security system, ADT could reasonably infer therefrom that CFU intended to pay for the service and an enforceable unilateral contract arose once the requested service was provided. (Doc. No. 32 at 16-18.)

authorize its maintenance employees to execute contracts binding on CFU. In support, Great Northern points to Keber's testimony that CFU did not give Keber blanket authority to handle all aspects of running the facility, Keber's description of his responsibilities as facilities manager, and limits on his discretion; and Pazo's testimony that he retained full authority to make decisions regarding contacting another service provider or approving payment of a service expense. Although Keber met and interacted with the service technicians, explained problems and signed service documents verifying that the service was performed, Great Northern contends those actions were not sufficient to establish that Keber's authority extended to the execution of contracts. Given the defined scope of responsibilities CFU granted to Keber, agreeing to limit CFU's legal rights would be an extraordinary act on his part. Thus, Great Northern submits that based on *Apex Financial Corp.,* 369 A.2d 483, 486 (Pa. Super. Ct. 1976), where a transaction does not fall within the ordinary duties of a person with an agent's job title, an additional burden is placed on the third party to inquire as to whether the agent had the power to make the obligation. In summary, Great Northern posits that the evidence establishes that CFU's executive board solely retained authority to execute contracts and explicitly did not represent to ADT that CFU's employees had such authority.

Great Northern's arguments are flawed in several respects. They ignore this Court's finding that CFU and ADT formed an implied contract for the repair of CFU's monitoring system through the authorized actions of the parties' employees. Therefore, in the limited circumstance of contracting for the repair of the monitoring system, CFU's employee Keber was authorized to bind CFU, notwithstanding the fact that Keber lacked general authority to bind CFU contractually. Moreover, Ferri did inquire as to whether Keber had authority to sign the Service Ticket, and was told by Keber that he did have such authority. Therefore, Ferri satisfied any additional burden that

24

may be imposed on him by *Apex Financial.*

In addition, viewing the evidence in the light most favorable to CFU, the Court finds that the following actions on the part of the principal, CFU, and/or its point person, Ed Pazo, suggested to the ADT service technician that Keber had apparent authority to bind CFU: (1) Ferri was aware that Keber went to his supervisor (Pazo) on November 18, 2004 for approval to remove and repair the Radionics panel while Ferri waited at CFU's facility; (2) the supervisor (Pazo) granted Keber authority to have the panel removed and repaired, and Keber communicated this approval to Ferri; (3) when servicing CFU's monitoring system, the same procedure was followed from 1994 to 2008, with Keber being the one who interacted with the service technician and who had authorization to sign the service tickets approving the repairs and verifying the work had been completed; (4) CFU, in particular, Ed Pazo, approved payment of the invoices for repairs/maintenance to the monitoring system, after having an opportunity to review the service tickets forwarded to him by Keber, although Pazo does not recall looking at the reverse side of the service tickets which contained the Limitation of Liability provision; (5) Pazo never personally interacted with the ADT service technician; and (6) no one from CFU ever communicated to ADT or its service technicians that it objected to the terms and conditions on the service tickets.   Thus, Pazo's grant of authority to Keber to have the repairs done and to sign the Service Ticket, in combination with the above conduct on the part of Keber and Pazo, provides a sufficient basis for Ferri to infer that CFU consented to have Keber act on its behalf with respect to the repairs to the Radionics panel, including the terms and conditions on the Service Ticket.

Great Northern asserts two additional arguments against apparent authority which can be disposed of quickly.  First, Great Northern submits that the evidence further shows that the two prior

contracts entered into with ADT that related to the purchase and installation of the system were signed by a CFU officer and executive board member, and that alone should have reasonably suggested to ADT that only officers of CFU have the authority to contractually bind CFU. Great Northern's argument misses the mark. The record indicates that ADT was not a party to any prior contracts for the purchase and installation of CFU's security monitoring system.[14] Therefore, CFU's prior written agreements with Rollins cannot be used to establish that ADT should have known that CFU did not vest Keber with apparent authority to enter into contractual arrangements. Second, even if the contracts with other security companies could be deemed relevant to this issue, they do not support a finding that CFU's employees could never bind CFU contractually. As explained above, although such contracts would provide evidence that Keber did not have *general* authority to enter into written contracts on behalf of CFU, they are simply inapposite to the determination of whether Keber was specifically authorized to approve the removal and repair of the panel by ADT and sign the ADT Service Ticket, thus binding CFU to the terms and conditions therein.

Regardless, Great Northern submits that whether or not an agency relationship exists is a question of fact to be decided by the jury unless facts giving rise to the relationship are undisputed, which, it argues, is not the case here. The Court disagrees. The record shows that the relevant facts are not disputed. Rather, what is disputed are the conclusions to be drawn from the application of the law to the undisputed facts. Thus, the Court may decide the issue of whether Keber had apparent

---

[14]As noted in the Court's September 17, 2007 Opinion, and as stipulated to by the parties in their concise statements of material facts, CFU contracted with Rollins Protective Service in January 1989 for the purchase and installation of a security detection system, which included monitoring and maintenance services for a three-year period. (Doc. 32 at 3.) In April or 1992, Rollins and CFU executed a new purchase and service agreement, extending maintenance and monitoring for 5 years. (*Id.* at 4.) Subsequently, SecurityLink provided monthly monitoring services up to the time it was acquired by ADT in August of 2001.

authority to bind CFU to the terms and conditions.

Next, the Court turns to whether there was any evidence that Ferri had actual knowledge of any limitations on Keber's authority. Ferri's testimony is relevant on this point. Ferri testified that Keber was the only person with whom he dealt at CFU; after he removed the Radionics panel, he inserted information on the Service Ticket and handed it to Keber for review, and told him there was information on the back of the ticket he might want to read; November 18, 2004 was the first time Ferri made Keber aware of the terms and conditions on the reverse side of the Service Ticket because he was taking the panel out of service and consequently, CFU's fire and security systems would be unable to communicate with ADT; however, Ferri did not read the Terms and Conditions to Keber or tell him what information was included on the back of the Service Ticket; Ferri understood that Keber was the one who would be called when Ferri arrived at CFU's facility to service its monitoring system; on November 18, 2004, Ferri inquired if Keber had authority to sign the Service Ticket and Keber responded that he was authorized to sign the service order and to order the panel removed; Ferri never asked Keber if he had authority to bind CFU to contractual arrangements; and Ferri did not know who Keber's supervisor was. (Ferri Dep. 85-99.)

Also, the following excerpt from Keber's deposition indicates that he did not convey any limitation on his authority to Ferri:

> Q.: Did you discuss with the ADT service person any limit upon your ability to sign, meaning I can sign in certain circumstances, but I can't sign in others?
> A.: No.
> . . .
>
> Q.: Did you discuss with the ADT employee any limitation that you had with respect to signing any documents for ADT?
> A.: No.

Q.:    Did you ever tell him that you were only authorized to sign for certain reasons but not other reasons?

A.:    No.

. . .

Q.    Did you ever send a letter or an e-mail or a fax to ADT that told them that you had limitations on your ability to sign service tickets?

A.:    No.

Q.:    Do you know if CFU ever sent any letters, e-mails, facsimiles to ADT identifying any limitation that you had when it came to signing service tickets?

A.:    No.

. . .

Q.:    Did you review the back and front of the service ticket after you signed it?

A.:    No. I didn't.

Q.:    Did the ADT person or serviceman hand you anything or give you any other information in addition to the service ticket itself?

A.:    No.

Q.:    Did you have any discussions with the ADT serviceman after you signed the ticket?

A.:    No.

. . .

Q.:    And you never told Mr. Ferri on November 18, 2005 (sic) that you had any limitation to your authority?

A.:    No, I didn't.

Q.:    And you didn't write him a letter after November 18, 2005 (sic) to limit your authority?

A.:    No, I gave him no letter to that effect.

Q.:    You did not send him any facsimile that indicates any limit to your authority?

A.:    That's correct.

Q.:    And you didn't send him an e-mail that limited your authority?

A.:    No, I didn't.

Q.:    And there was no verbal communication to indicate that you had any limitation to your authority to hire him?

A.:    That's correct.

Q.:    And as far as you know, CFU did not give Mr. Ferri any notification that you had any limitation to your authority?

A.:    That's correct.

Q.:    And from November 18, 2004 until today, you've never seen

> any document from CFU to indicate that it identified or
> notified ADT or Mr. Ferri that you had any limitation to your
> authority to hire him and to seek the service that you
> requested.?
>
> A.:    That's correct.
>
> Q.:    And the same holds true on January 26, 2005?
>
> A.:    Correct.
>
> . . .
>
> Q.:    Did you have the ability to hire Kevin Ferri and ADT on
> November 18, 2005 (sic) to fix the system?
>
> A.:    No. I had the authority to call them to fix the system, but I
> don't hire them, they were under contract already with us.
>
> Q.:    That's what you believe?
>
> A.:    I believe that, yes, they're our service provider, and all I'm
> doing is acknowledging that they provided the service.

Keber Dep. at 124, l. 11-15; 158, l. 21-25; 159, l. 1-17, 24-25; 160, l. 1-8; 249, l. 1-25; 250, l. 1-5; 252, l. 4-12. Thus, the Court finds that the undisputed evidence shows that Ferri did not possess actual knowledge of any limitations on Keber's authority.

Finally, ADT argues that Ferri's reliance on the apparent authority of Keber was a reasonable interpretation of CFU's manifestations. In support, ADT contends that prior to November 18, 2004, Ferri had been led to believe and so believed that Keber was the person responsible for the management of CFU's security system, given their past dealings (i.e., Keber requested service and signed the Service Tickets), Keber's position as facilities manager, their discussion during the service call on November 18, 2004, and Keber's representations to Ferri. Therefore, ADT submits that Ferri and it reasonably believed Keber had authority to contract for the repairs and agree to the terms conspicuously set forth on the Service Ticket.

In response, Great Northern advances several arguments to show that ADT's belief in Keber's apparent authority was unreasonable. First, Great Northern submits that Ferri's understanding of the purpose and function of the Service Ticket presented to Keber for signature was

in accordance with Keber's understanding–the Service Ticket confirmed that ADT appeared for the service call and performed all necessary work, and Keber authorized the removal of the panel. While that may be true, Ferri also understood Keber had authority to sign the Service Ticket, which contained the terms and conditions and which Ferri pointed out to Keber before he signed the Service Ticket.

Next, Great Northern submits that Ferri did not know what information was being conveyed by the "legal language" on the back of the ticket and asked Keber to sign the November 18, 2004 Service Ticket without knowing it contained a Limitation of Liability provision. However, Great Northern fails to explain how this shows Ferri's belief in Keber's authority was unreasonable.

Finally, Great Northern contends that the course of dealings between the parties shows that Ferri's belief in Keber's apparent authority was not reasonable. In support of its position, Great Northern advances several arguments. First, Great Northern proffers the fact that prior to November 18, 2004, Ferri presented service tickets to Keber without any reference to the Terms and Conditions on the back of the service tickets. November 18, 2004 was the first and only time Ferri referred to the Terms and Conditions on the back. This argument is unavailing. Apparent authority may be gleaned from a course of dealing *or a single transaction*. *Turner Hydraulics,* 606 A.2d at 535 (emphasis added). Therefore, apparent authority may be determined based on the parties' conduct surrounding only the November 18, 2004 Service Ticket.

Second, Great Northern argues that a common factor in cases finding apparent authority is the agent's assurance that the principal will simply rubber stamp his discussion, relying on *Bolus,* 525 A.2d at 1222. Great Northern submits that there is simply no evidence in this case to suggest that Pazo or the executive board of CFU simply rubber-stamped Keber's recommendations regarding

the alarm system. The Court finds this argument unavailing as well, as the evidence of record belies Great Northern's assertion. Keber testified that he did not seek prior approval from Pazo for all repairs to the security monitoring system, but rather sought prior approval only when the cost of the repairs was substantial or involved circumstances like those on November 18, 2004, where the impact of the recommended repair effectively disabled the entire monitoring system. (Keber Dep. at 122-24.) Pazo testified that he routinely approved payment of the repairs that were authorized by Keber. (Pazo Dep. at 126.) This evidence certainly suggests that Pazo did rubber stamp Keber's recommendations regarding repairs to CFU's security monitoring system on several occasions.

Third, Great Northern contends that the business dealings between ADT and CFU were not handled by the technicians or maintenance personnel of their respective companies, and that ADT knew or should have know that an important business communication, such as the assumption of contractual obligations and the terms and conditions of those obligations, could and should have been conveyed to CFU's corporate officers, as they had conveyed their assumption of Rollins' contract.[15] To demonstrate that Keber was not the only individual at CFU with whom ADT had business dealings, Great Northern attempts to show that ADT also dealt with Pazo, from the mere fact that Pazo received and read the August 10, 2001 letter from ADT informing CFU that it had acquired SecurityLink and was taking over the monitoring services. Great Northern also takes issue with ADT's failure to set forth any exculpatory conditions or limitations of liability in the August 2001 letter, and its failure to include a contract to CFU for execution. The Court finds no merit to this argument. First of all, the August 2001 letter was addressed to "Valued Customer" not Pazo,

---

[15]In reviewing the record, ADT did not assume the "Rollins' contract" as Great Northern suggests, but rather, acquired SecurityLink and "conveyed that assumption" to CFU in the August 2001 letter.

and was evidently a form letter that ADT sent to all existing customers of SecurityLink after the acquisition was finalized. This form letter alone, without any evidence of personal interaction, can hardly be construed as demonstrating business dealing with another *individual*, *i.e.*, Pazo, at CFU, especially where the letter did not require or request any action on the part of the customer. In addition, to the extent that CFU attempts to establish a course of dealing through ADT's failure to set forth exculpatory language in, or attach a new contract to, the August 2001 form letter, this argument also lacks merit. Great Northern attempts to sidestep the fact that the contract ADT acquired was for *monitoring* services, not service and repairs. Thus, it is of no moment that the August 2001 letter did not contain either exculpatory language or a new contract because the contract that ADT seeks to enforce is the implied contract for the repair services to the Radionics panel, not the contract for monitoring services.[16]

Accordingly, the Court finds that a reasonable jury could not conclude that Keber did not have apparent authority to sign the Service Ticket and bind CFU to the terms and conditions contained on the reverse side, including the Limitation of Liability provision, and that ADT's belief that Keber had such apparent authority was reasonable. Therefore, the Court finds that ADT is entitled to summary judgment in its favor on this issue.[17]

---

[16]Along these same lines, Great Northern also argues that from 2001 to the flood in 2005, ADT sent monthly invoices for its alarm *monitoring* services to CFU's executive offices for payment and those invoices did not contain any exculpatory language or limitation of liability provision, and that CFU received and paid these invoices without the knowledge that there was any contractual limitation imposed by ADT for its services. While that may be true, it simply has no bearing on the contractual dispute here, which involves an implied contract for repairs to the Radionics panel.

[17]Buried on page 18 of its Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Great Northern makes a motion to strike paragraphs 4 and 24 of the Affidavit of Kevin Ferri. (Doc. No. 57 at 18-20.) A motion to strike must be separately docketed and noted on the face of the filing, neither of which was done here. Therefore, this motion cannot be ruled on as there is not pending motion on the docket. Nonetheless, the Court would deny the motion as moot as it has not

## B.     Spoliation of Evidence

ADT also moves for summary judgment on the issue of spoliation of evidence. In particular, ADT submits that CFU has not produced for examination a component part of the wet sprinkler system known as a "T," despite having maintained possession, custody and control of the damaged premises at all times and repeated requests by ADT.  ADT contends that it is severely prejudiced because it cannot examine the alleged failed "T," and therefore, cannot prove or disprove CFU's theory of causation and relatedness of a significant amount.  ADT submits that a lesser sanction than granting summary judgment does not exist that will offer protection to ADT and deter further spoliation activity.

In response, Great Northern argues that ADT has failed to establish either that Plaintiff was at fault in any degree for the loss of the "T" coupling, that ADT was prejudiced by Plaintiff's actions, or that the extreme sanction of summary judgment is warranted or appropriate.  Great Norther further submits that the only authority cited by ADT, *Tenaglia v. Proctor & Gamble,* 737 A.2d 306, 308 (Pa. Super. Ct.1999), confirms that imposing spoliation sanctions requires weighing the facts, and ADT has failed to establish the absence of an issue of fact on this issue.  Great Northern submits that CFU never removed, discarded or withheld the "T" coupling at issue, and has diligently searched for the "T" and reasonably believes that a remediation contractor or sprinkler contractor inadvertently discarded it.  In support, Great Northern proffers the affidavit of Robert Keber dated February 26, 2009 (Ex. D in Pl.'s App. (Doc. No. 59)) and the deposition testimony of Ralph Cortese (Ex. E in Pl.'s App.), the service technician for CFU's sprinkler contractor.

---

relied on the paragraphs from Ferri's affidavit that Great Northern seeks to strike in ruling on the summary judgment motion.

In determining whether a sanction is appropriate for spoliation of evidence, courts have considered the following three key factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir. 1994) (citations omitted); *Schroeder v. Commw. of Pa., Dep't of Transp.,* 710 A.2d 23, 27 (Pa. 1998) (Pennsylvania Supreme Court expressly adopted the three-prong test applied by the court of appeals in *Schmid*).

The Court finds that ADT is not entitled to the extreme sanction of summary judgment for alleged spoliation of evidence. The evidence does not show conclusively that Great Northern was at fault for the loss or destruction of the "T." An issue of fact exists as to when Great Northern knew of a potential subrogation claim against ADT. "[T]he knowledge of a *potential* subrogation claim is deemed sufficient to impose a duty to preserve evidence." *Baliotis v. McNeil,* 870 F.Supp. 1285, 1290 (M.D.Pa. 1994)(citation omitted). The record does not indicate when Great Northern knew of a potential subrogation claim, such that a duty arose to preserve evidence. In addition, the record fails to indicate whether ADT requested that Great Northern preserve the "T," and/or the date of any such request. As to the second factor, ADT has not shown that it is unable to defend the claims against it this case. Indeed, ADT retained an expert who was able to proffer an expert opinion regarding the cause of the malfunctioning of CFU's sprinkler system, based on the available evidence.[18] (Ex. G in Pl.'s App.) In addition, ADT's expert opined that the cause of the flood on

_____

[18]In his expert report, Kenneth M. Garside indicated that in rendering an opinion, he reviewed file material related to this case and a compact disk containing inspection photograph image files, as well as conducted an inspection of the building construction aspects related to the January 23, 2005 water

January 23, 2005 was the improper installation of the sprinkler system, as opposed to a defective "T" coupling. (*Id.* at 9.) Therefore, as this case does not involve a products liability claim, but rather, involves breach of implied warranty and negligence claims, the availability of the "T" coupling is not as critical to ADT's defense. As to the third factor, this Court concludes that ADT has not shown that the extreme sanction of summary judgment is warranted or appropriate here. In *Kalumetals, Inc. v. Hitachi Magnetics Corporation,* 21 F.Supp.2d 510, 519 (W.D.Pa. 1998), then Chief Judge Ziegler noted that summary judgment based on spoliation of evidence had been imposed only in products liability cases by Pennsylvania courts, and he declined to extend application of this sanction to claims of breach of contract and negligence. *Id.* ADT has not brought to this Court's attention, nor could this Court find upon its own research, any cases where summary judgment was imposed as a sanction for spoliation of evidence outside the products liability context, and this Court likewise declines to extend it.

Thus, based on application of the *Schmid* factors to this case, the Court concludes that ADT has failed to show that a sanction for spoliation of evidence is warranted here, let alone the extreme sanction of summary judgment. The Court's conclusion does not, however, preclude ADT from filing a motion *in limine* or requesting a jury instruction as to a spoliation inference, should this case proceed to trial.

## V. __CONCLUSION__

For the reasons set forth above, the Court will grant Defendant's Motion for Summary

---

loss. (Ex. G in Pl.'s App. at 1.) Mr. Garside further indicated that he reviewed the International Fire Code (2003 ed.) applicable to maintenance of the subject building fire protection equipment (*id.* at 6), and was provided with the broken 90 degree elbow installed as a component part of the CFU deluge system manual actuation valve (*id.* at 8).

Judgment (Doc. No. 46) with regard to the Limitation of Liability provision contained on the November 18, 2004 Service Ticket, and holds that Great Northern is limited to a recovery of $1,000.00 should it be able to establish liability. The Court will deny Defendant's request for summary judgment as a sanction for spoliation of evidence. An appropriate order will follow.

Dated: September 30th, 2009                                    BY THE COURT:


                                                         s/ Terrence F. McVerry
                                                        United States District Judge

cc:     Honorable Lisa Pupo Lenihan
        U.S. Magistrate Judge

        All Counsel of Record
        *Via Electronic Mail*